308 So.2d 402 (1975)
F. I. WRIGHT and B. O. Red et al., Plaintiffs-Appellees,
v.
SABINE RIVER AUTHORITY of the State of Louisiana, Defendant-Appellant.
No. 4789.
Court of Appeal of Louisiana, Third Circuit.
January 23, 1975.
Rehearing Denied March 12, 1975.
Writ Refused June 6, 1975.
*404 Alvis J. Roche, Lake Charles, and Makar & Whitaker by John Makar, Natchitoches, for defendant-appellant.
Taylor, Porter, Brooks, & Phillips by Tom F. Phillips, Baton Rouge, for plaintiffs-appellees.
Before FRUGÉ, HOOD, CULPEPPER, MILLER and WATSON, JJ.
HOOD, Judge.
This suit was instituted by fifteen persons who operate commercial establishments on the shores of the Toledo Bend Dam Reservoir, in Sabine Parish, to enjoin defendant, Sabine River Authority of the State of Louisiana, from imposing fees, charges or rents upon plaintiffs for the use of lands abutting the reservoir. Defendant reconvened to recover from plaintiffs sums allegedly owed to Sabine under various "Commercial Use Permits" which it had issued to most of the plaintiffs, or alternatively to cancel or annul the "leaseback" agreements which previously had been entered into between plaintiffs and Sabine. Plaintiffs excepted to the reconventional demand, alleging insufficiency of service of process on them.
Judgment was rendered by the trial court in favor of plaintiffs sustaining the exception of insufficiency of service of process of the reconventional demand, and granting to plaintiffs the injunctive relief which they sought. Defendant Sabine appealed.
This case was consolidated for trial and appeal with two related suits instituted by Sabine River Authority against other parties, in both of which suits the plaintiff seeks to recover fees, charges or rents alleged to be due under Commercial Use Permits. The trial court rendered judgment in favor of the defendant in each of those cases, and Sabine appealed. We are rendering a separate judgment in each of those suits. Sabine River Authority, State of Louisiana v. Pendleton Bridge Marina, Inc., 308 So.2d 420 (No. 4787 on our docket); *405 Sabine River Authority, State of Louisiana v. Flying Bridge Marina, Inc., 308 So.2d 422 (No. 4788 on our docket).
The principal issues presented are (1) whether Sabine River Authority may legally impose fees, charges or rents on plaintiffs for the use for commercial purposes of property abutting the Toledo Bend Dam Reservoir, and (2) whether plaintiffs made a general appearance in this case sufficient to constitute a waiver of service of process of the reconventional demand.
The construction of the Toledo Bend Dam on the Sabine River, a navigable stream, and the impounding of waters by that facility, was a joint project of the States of Texas and Louisiana. The project was constructed pursuant to a license granted by the Federal Power Commission, and was financed partially by bonds to be paid with revenues derived from the sale of hydroelectric power, and partially by appropriated funds of the two states. The project involved the taking of private lands on both sides of the river by the appropriate authority of the respective states.
The Sabine River Authority, State of Louisiana, was created as an agency of this state and a body politic by Act 261 of 1950 (LSA-R.S. 38:2321 et seq.). Pursuant to the power vested in it by that statute, Sabine acquired title to lands in Louisiana, including the property lying between the contour of 172 feet above mean sea level, that being the normal pool stage, and the contour of 175 feet above mean sea level, or a 50 foot distance horizontally from the 172 foot contour, whichever is greater. It was determined in Louisiana that, although the state owned this strip of land at least 50 feet wide abutting the reservoir, the state would lease back to the landowner that strip, extending from the shore of the reservoir landward to the landowner's property. The lease in each instance was for a term of 99 years, and the rental paid by the landowner was 75 percent of the price the state had paid for the leased property. The agreements entered into between Sabine and these landowners were called "leaseback" agreements.
The leaseback agreements gave the lessees the right to possess the leased property, subject to the terms and conditions therein specified. Each such agreement provided that the lessee could use the property "To construct and to own docks and wharves for boating, fishing and swimming and boat houses and related installations on the shoreline for the use of LESSEE." It also provided that "If hereafter it is ascertained by the AUTHORITY that other rights can be invested in the LESSEE, his heirs and assigns, such rights shall be granted for no additional consideration."
Each leaseback agreement also provided that:
"LESSEE shall not have the right to make any commercial use of said property without the written consent of AUTHORITY."

The dam was closed and the waters began being impounded in October, 1966, and the normal pool stage of 172 feet above mean sea level was reached in April, 1968. Shortly after the normal pool stage was reached, plaintiffs constructed marinas or other commercial establishments along the shores of the reservoir, and since that time they have operated those establishments for commercial purposes.
On August 24, 1967, which was before plaintiffs began operating their commercial establishments, the Authority adopted and published an Official Manual of Policy, Rules and Regulations, relating to the reservoir. It specified in that publication that a lessee would have to obtain a permit from the Authority before he could use the leased property for commercial purposes, that certain fees and charges would have to be paid by the lessee in advance for such a permit, and that other fees and charges were to be paid annually by the lessee for the privilege of operating the commercial establishment.
*406 The provisions of the above mentioned manual were not implemented until 1970. During the year 1970, however, each of the plaintiffs, except one, F. I. Wright, applied to the Authority for a "Commerical Use Permit" authorizing him to operate a commercial establishment on the strip of land which had been leased to him. The Authority granted a permit to each of said applicants, authorizing him to operate a commercial establishment on the leased property for a period of three years. Every such permit was accepted and signed by the lessee, and each provided for the payment of a "minimum assessed fee" which was to be paid in advance upon approval of the permit, and in addition thereto the lessee was to pay to the Authority annually other charges, fees and rentals, including a fee equal to two percent of his gross income received from goods and services sold upon the premises subject to the permit. The permit, signed by the Authority and by the lessee, constituted a contract between those parties. Each such permit, after specifying the minimum assessed fee due by that lessee, contained the following significant provisions:
"It is agreed that the above shall be the minimum assessed fee which shall be paid in advance upon approval of this permit. In addition, the Permittee shall pay to the Authority a fee equal to two percent (2%) of his gross income received on all goods, services, boat and motor rentals, food, supplies, etc., sold upon the premises subject to this permit."
* * * * * *

"Terms: Contingent upon the annual payment by the Permittee of the fees, rentals and charges outlined above this permit is granted for a period of three (3) years from date hereof ..."
* * * * * *
"The additional charge of two percent (2%) of the gross income from business conducted on premises subject to this permit shall be paid in full on or before January 15 for the calendar year immediately preceding. The Permittee shall compute the charge from his financial records and make available to the Authority all supporting data including copies of his monthly sales tax returns. When required, the Permittee will allow an audit of his books and records by an authorized representative of the Louisiana Department of Public Works for the Sabine River Authority, State of Louisiana."
The applicant in each case paid the "minimum assessed fee" in advance of the issuance of the permit, but he had refused to pay annually the other fees, and particularly the fee of two percent of his gross income, as provided in the permit. None of the payments required by that permit have been made by plaintiffs, therefore, other than the initial "minimum assessed fee." The Authority has made formal demand upon all of the plaintiffs for payment of those fees, but no such payment has been made.
No permit was ever issued to plaintiff Wright. He purchased a business establishment which was already in operation on March 29, 1971, and he had continued to operate the business since that time, although he had never applied for and was never issued a permit to do so. He has rejected the demands of Sabine for payment of the basic fee (the "minimum assessed fee") and the annual fee of two percent of his gross business sales.
Each of the plaintiffs has constructed improvements on the property affected by the leaseback agreement which he signed. The Authority has not constructed buildings or improvements on any of the property affected by those agreements.
The dam and reservoir were built at least partially with public funds, and both of those facilities have been operated for the benefit of the public. The lessees under the leaseback agreements are not required to pay any fees, charges or rents for the private use of the property affected by those agreements. They are required *407 by the Authority, however, to pay fees, charges or rents for using the leased property for commercial purposes.
After Sabine made demands on plaintiffs to pay the fees, charges or rents provided in the various Commercial Use Permits, plaintiffs instituted this suit to enjoin Sabine from attempting to impose these fees or charges on them, and from attempting to deny plaintiffs the right to continue to operate their commercial establishments.
Plaintiffs contend primarily that the fees and charges which Sabine is attempting to exact from them are illegal for four reasons:
"1. The fees and charges amount to a levy of taxes, and the Sabine River Authority has no power to tax under the provisions of LRS 38:2324.
"2. Alternatively, the fees and charges are imposed as rent under the leaseback agreements, and rent for the full term of the lease having already been paid, the sums are not due and cannot be collected.
"3. The charges and fees attempted to be imposed cannot be justified as payment for services or facilities furnished by the Sabine River Authority.
"4. The commercial use permits which were executed are not enforceable because, for the aforementioned reasons, they are illegal, without cause and entered into under duress and without the legal consent of the marina operators being first given."
Defendant concedes that it does not have the power to tax, but it contends that the requirement that the lessee under a leaseback agreement pay a fee or charge for the privilege of making commercial use of the leased property is not a tax levy, but instead is a rate, charge or rental which it is authorized to impose by LSA-R.S. 38:2325(f) and LSA-R.S. 38:2331. Defendant also takes the position that plaintiffs have not paid the charges or rentals which they own and which most of them agreed to pay for making commercial use of the leased property, that defendant has furnished facilities and services to plaintiffs, that plaintiffs were not under duress when the Commercial Use Permits were applied for and accepted by them, and that those agreements are valid and enforceable. Alternatively, defendant contends in its reconventional demand that the leaseback agreements are void or that they have been breached by plaintiffs and should be annulled or cancelled.
The trial judge held that the Sabine River Authority has the power to regulate the commercial enterprises being operated by plaintiffs, but that it does not have authority to impose any fee, charge, rate or rental on plaintiffs, because it has furnished no "facilities" to, and has rendered no "services" for plaintiffs. Judgment thus was rendered in favor of plaintiffs, granting them the injunctive relief which they seek.
At the time the Commercial Use Permits were issued, LSA-R.S. 38:2324, (as amended by Act 432 of 1956) provided, in part, that:
"The Sabine River Authority is hereby declared to be an agency and instrumentality of the state of Louisiana ... but without power to levy taxes."

That section of the Revised Statutes was amended by Act 453 of 1974, which became effective after the judgment appealed from was rendered, and since that amendment the pertinent part of that section reads:
"... It (Sabine River Authority) shall not have the power to levy taxes but it may assess and collect charges, fees and rentals for the use of its lands or water bottoms and for the construction, installation, maintenance and operation on such lands or water bottoms, or on the surface of any lake or reservoir owned by it or in which it has an interest, any wharf, dock, boathouse, pier, marina, shop, store, gasoline dispenser or other commercial establishment ..."
*408 LSA-R.S. 38:2325(f) provides that the Sabine River Authority shall have the power:
"(f) To fix, maintain, collect and revise rates, charges and rentals for the facilities of the Authority and the services rendered thereby." (Emphasis added).
And, LSA-R.S. 38:2331 provides:
"The board of supervisors for the Authority shall have the power to adopt and promulgate all reasonable regulations to secure, maintain and preserve the sanitary conditions of all waters in and to flow into any reservoir owned by the Authority, to prevent waste of water or the unauthorized use thereof, to regulate residence, hunting, fishing, boating and camping and all recreational and business privileges along or around any such reservoir, the Sabine River and its tributaries." (Emphasis added).
The above quoted statutory provisions make it clear, we think, that the Legislature intended to give Sabine the power to regulate business privileges, and to assess and collect fees, charges and rentals for the use of its facilities by commercial establishments and for services rendered by it to those establishments, and that the Legislature did not consider the imposition of such fees, charges or rents to be the levying of a tax. We believe that Act 453 of 1974, amending LSA-R.S. 38:2324, was adopted as remedial legislation for the purpose of clarifying the meaning of that section of the Revised Statutes, and that the 1974 amendment thus applies retrospectively.
Plaintiffs contend, however, that since Sabine is prohibited from levying taxes, it cannot charge license or permit fees, unless the collection of those fees is related to the exercise of the police power of that Authority. They argue that "there was no evidence whatsoever to establish any relationship between the cost of the regulation of the commercial operator and the fee schedules attempted to be imposed." They reason that since there was no showing of regulations applicable to commercial operators, and no showing of regulatory action relating to the exercise of the police power, the charging of permit fees constitutes the illegal and unauthorized taxation of the commercial operators. They rely on Ewell v. Board of Supervisors, etc., 234 La. 419, 100 So.2d 221 (1958).
In Ewell, plaintiffs attacked the constitutionality of an act of the Legislature authorizing the sale of bonds and the pledging of revenues to be derived from the enforcement of three agricultural statutes. The agricultural statutes provided regulations for the sale of fertilizer, feed and pesticides, and they imposed licenses, fees, fines and penalties in connection with the sale of those commodities. The issue presented was whether the agricultural statutes were regulatory, enacted in the exercise of the state police power, or whether they were revenue-producing measures levied in the exercise of the taxing power of the Legislature. Our Supreme Court held that a license imposed for revenue is an exercise of the taxing power and is in effect a tax. A license imposed for the purpose of regulation and the protection of the public health, morals and general welfare is an exercise of the police power of the state. It concluded that the agricultural statutes were revenue-producing measures, that the revenues could be pledged to secure the bonds, and that the statute being attacked by plaintiffs thus was constitutional. In that case, however, the evidence showed the exact cost of administering the agricultural regulations, the amount of the revenues which had been derived from the license fees, fines and penalties over a period of six years, and it showed the very large excess of revenues over expenditures during each of those years. It was apparent that the agricultural statutes were enacted solely as revenue-producing measures.
The evidence in the instant suit, unlike that in Ewell, does not show the cost of *409 regulating the Toledo Bend Dam and reservoir, or of making and enforcing the other regulations required in LSA-R.S. 38:2331, or the amount which Sabine expected to receive from the permit fees and charges it imposed on lessees for the privilege of making commercial use of leaseback properties. There was no showing that there was an excess of revenues over the cost of regulating the facilities, and thus there is no evidentiary basis for holding that the permit fees produced any excess revenue at all.
Plaintiffs in this case are asserting that the actions of Sabine in attempting to collect permit fees is illegal, because the collection of those fees amounts to the imposition of a tax instead of a regulatory measure in the exercise of defendant's police power. We think the burden of proof rests on plaintiffs to show that the imposition of permit fees has no reasonable relationship to the regulation of the dam and reservoir. No evidence has been produced tending to support plaintiffs' position, and we hold that they have failed to sustain the above burden of proof. LSA-R.S. 38:2331 requires that Sabine regulate these facilities, and the evidence shows that defendant does actively make and enforce at least some such regulations. The law specifically authorizes defendant to fix and collect charges and rents for services and the use of facilities. A presumption exists, we think, that the fees and charges claimed by defendant are proper. No evidence has been produced here to offset or overthrow that presumption. We find, therefore, that the imposition of permit fees and charges by defendant are regulatory measures which the latter is entitled to exercise under its police power.
Plaintiffs contend next that the fees and charges stipulated in the "Commercial Use Permits" have already been paid, and that defendant cannot require that they be paid again. Their argument is that the payments which they made under the leaseback agreements constituted payment in full for the use of the leaseback property for all purposes. They point out that each leaseback agreement provides that "no additional consideration" shall be charged for granting other rights to the lessees, and they argue that although defendant may determine whether a commercial use permit may be issued, the leaseback agreement itself prohibits Sabine from charging any additional fee for that permit.
One answer to that argument is that when a commercial use permit was accepted by a lessee, it became a contract between that lessee and Sabine, and it thus amended the earlier leaseback agreement. Another answer is that the payment made under the leaseback agreement did not cover the use of the property for commercial purposes, and defendant was not bound by law or by the agreement to permit the lessee to make commercial use of the property. It is true, as pointed out by plaintiffs, that the leaseback agreement provides that if "other rights" can be invested in the lessee, such rights shall be granted for no additional consideration. That provision is followed immediately, however, with the stipulation that Lessee shall not have the right to make any commercial use of said property without the written consent of Authority. And, LSA-R.S. 38:2325(f) specifically authorizes Sabine to collect charges for facilities and services. When the stipulations in the agreement are considered with the cited statute, it appears to us that there was never an intent to preclude Sabine from assessing rates, fees or charges for allowing commercial establishments to operate on the edge of the reservoir. The payments stipulated in the Commercial Use Permit are proper regulatory fees which defendant legally could exact under its police power, and we do not find the imposition of those permit fees to be inconsistent with the provisions of the leaseback agreements.
Our conclusion is that plaintiffs did not pay for the privilege of making commercial use of the leased property when they *410 paid the consideration stipulated in the leaseback agreement, and that Sabine thus is not precluded from assessing additional charges and fees for permitting plaintiffs to operate commercial establishments on that property.
Plaintiffs also argue that the charges and fees being imposed cannot be justified as payment, for "facilities of the Authority" or for "services rendered thereby," as authorized by LSA-R.S. 38:2325(f). Their argument is that the reservoir was constructed with public funds for the general use of the public, that Sabine does not have a proprietary interest in the reservoir or the property surrounding it sufficient to entitle it to exact charges from the public for using the reservoir or that property. They contend that the reservoir and the lands covered by the leaseback agreements are "public things," as defined in Article 453 of the Louisiana Civil Code, and that all citizens are entitled to use them without being required to pay for that privilege.
Plaintiffs obviously construe the word "facilities," as used in LSA-R.S. 38:2325(f), to mean only buildings or improvements on the property. We gather that from their argument that no plaintiff has received any financial assistance from Sabine "in the construction of his facilities," and that plaintiffs were furnished no facilities by the Authority. We think the Toledo Bend Dam, and the reservoir which was created by the construction of that dam, are "facilities" as that term is used in LSA-R.S. 38:2325(f). The dam and the reservoir were constructed, just as a building or any other structure is built. The reservoir, created or constructed by Sabine, is a "facility" for boating, bathing, fishing, or hunting, It is a facility which produces hydroelectric power, and one which effectively impounds water which is sold for various purposes. The reservoir is a facility which is important, and perhaps essential, to plaintiffs in the operation of their marinas, since we assume that businesses of that type must be located on or adjacent to a stream or body of water.
The evidence shows that Sabine performs a number of regulatory services in connection with the operation and maintenance of the dam and reservoir. It regulates the flow of water through the dam, the production of hydroelectric power, the water level of the reservoir and the impounding and sale of fresh water. R. D. Morgan, the Chief Engineer of Sabine, testified that the staff of that Authority promotes quality development on the shores of the lake or reservoir, it protects the waters from pollution, and it looks after the safety of the general public in the use of the reservoir. The Authority controls the discharge of sewerage into the reservoir by regulating the issuance of sewerage permits, and in that manner it helps to avoid pollution. Two of the plaintiffs stipulated that they had been required by the Authority to "replace certain sanitary sewerage facilities" on property affected by leaseback agreements to control pollution. The manual issued by the Authority in 1967 contains many regulations relating to the use of firearms, gambling, boating, camping, hunting, fishing, bathing, picnicking, and other recreational activities on and around the reservoir. All of these services benefit plaintiffs, as the operators of commercial establishments on the shores of that body of water.
We conclude that Sabine has furnished "facilities" and has rendered "services" for plaintiffs, as those terms are used in LSA-R.S. 38:2325(f).
Plaintiffs classify the property affected by a leaseback agreement as being a "public thing," and they argue that Sabine does not have such proprietary interest in that property that it can exact a charge from the public for using it. They rely on LSA-C.C. Article 453, which provides:
"Art. 453. Public things are those, the property of which is vested in a whole nation, and the use of which is allowed *411 to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
"Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors."
The tracts of land affected by the leaseback agreements involved in this suit are strips of high land abutting the Toledo Bend Dam Reservoir. They are not covered by water, they are not used as roadsteads or highways, and the record does not show that they have ever been dedicated to public use. The title to each such tract is vested in the Sabine River Authority. It is not "vested in a whole nation." We find no basis on which the property involved in this suit could be compared to any of the "things" listed as illustrations in the above quoted article of the Civil Code.
In Louisiana, property owned by the state or by its political subdivisions is divided into two classifications, namely, property of the "public domain," and property of the "private domain." Articles 453 and 454, and Article 458, paragraph 1, of the Civil Code refer to property of the public domain, while Article 458, paragraph 2, and Article 484 refer to property of the private domain. Things of the private domain of the state are alienable in accordance with the existing statutes and regulations. See A. N. Yiannopoulos, Louisiana Practice, Civil Law of Property, Sec. 38; Landry v. Council of Parish of East Baton Rouge, 220 So.2d 795 (La.App. 1 Cir. 1969).
In Anderson v. Thomas, 166 La. 512, 117 So. 573 (1928), our Supreme Court said:
"The Civil Code draws a distinction between public things, the property of which is vested in the state, but the use of which is common to all the inhabitants thereof, `and even strangers, such as the seashore, river beds, highways, streets, and public parks, and public property, which is not for the common use of the inhabitants, but may be employed for their benefit, such as, for instance, the public offices, police and fire stations, markets, schoolhouses, etc. R.C. C. 453, 454, 458.
"The latter class of public property belongs absolutely to the municipality by which it has been acquired and may be dealt with as the municipality sees fit, subject only to the restrictions imposed by the deed of acquisition or by special laws.
"The former class of public things belongs to the people, i. e., to the state, and the municipalities have only the administration thereof, unless otherwise authorized by special laws. And to this class belongs the property in controversy herein."
The Court of Appeal, First Circuit, held in Landry v. Council of Parish of East Baton Rouge, supra, that:
"Considering the applicable codal provisions and pertinent jurisprudence, it would appear that public property in the public domain envisions such publicly owned property and facilities as are open to the use of all peoples indiscriminately and without charge and which serve no quasi-commercial or proprietary purpose. Included in this classification are streets, public parks, public walks, libraries, public squares and museums.
"On the other hand, publicly owned property or facilities which by their nature are not open to use by the general public but are employed for the common good, such as public offices, police and fire stations, auditoriums and schoolhouses, would appear to fall within the classification of public property in the private domain. In this same order would be included publicly owned property of a quasi-proprietary or quasi-commercial nature such as public markets, airports and port facilities open to that *412 segment of the public having need therefor and for whose use a fee or charge is levied.
"We conclude a public airport is not common property to the use of which all are entitled and therefore such facilities do not fall within the classification of public property in the public domain. On the contrary, such facilities are by their very nature restricted in use. Obviously such an installation may be availed of only by those who own, rent or travel by small private airplanes. Moreover, an airport is commercial in nature or at least quasi-commercial in that those who use its facilities are charged for the privilege."
We have concluded that the leaseback properties involved in this suit should be classified as public property in the private domain, such as public markets, airports, public auditoriums or stadiums, public offices, fire stations, police stations, and school buildings. We think Sabine has the right and authority to lease the property it owns abutting the reservoir to private persons, and to levy fees or charges for the privilege of using that property for commercial purposes.
Plaintiffs contend next that they are not bound by the obligations they assumed in accepting the Commercial Use Permits, because they accepted those permits under duress, and that the contract thus is void for lack of valid consent. They claim that they were intimidated, and were thus forced to accept the permits, by threats made by the Authority to void the leaseback agreements and to evict them unless they signed. Their argument is that the threats made by Sabine to cancel the leaseback agreements were not legal threats, since the Authority had no legal ground for taking such action, that there was no other cause for the contract, and that under those circumstances a threat even of slight injury is sufficient to invalidate the Commercial Use Permit. They rely on LSA-C.C. Article 1859, which reads:
"Art. 1859. All the above articles relate to cases where there may be some other motive, besides the violence or threats, for making the contract. Where, however, there is no other cause for the contract, any threats, even of slight injury, will invalidate it."
We find nothing in the record which shows that defendant, or any of its agents, ever threatened to cancel a leaseback agreement involved in this suit, or to evict any of the plaintiffs from the property affected by those agreements. Assuming that such threats were made, however, we find that those threats did not constitute duress.
We have held that the leaseback agreements did not grant to plaintiffs the right to use the leased property for commercial purposes, and that Sabine had the right to assess fees and charges for permitting plaintiffs to make commercial use of that property. The evidence shows that immediately prior to the time the commercial use permits were issued to and accepted by most of the plaintiffs, the latter were using the leaseback properties for commercial purposes without the consent of the Authority, in violation of the specific provisions of the leaseback agreements. The plaintiffs thus were violating the terms of the lease when defendant began negotiating with them about the issuance of Commercial Use Permits, and Sabine had the legal right at that time to cancel the leaseback agreements and to evict plaintiffs.
Article 1850 of the Civil Code provides that consent to a contract is void, if it is produced by violence or threats, and the contract is invalid. Article 1856, however, provides:
"Art. 1856. If the violence used be only a legal constraint, or the threats only of doing that which the party using them had a right to do, they shall not invalidate *413 the contract. A just and legal imprisonment, or threats of any measure authorized by law and by the circumstances of the case, are of this description."
The threats which Sabine allegedly made in this instance were threats only of doing what the party using them had a right to do, and they do not invalidate the contract. We thus find no merit to plaintiffs' claim that the Commercial Use Permits are invalid because of duress or lack of consent.
We turn now to the question of whether plaintiffs made a general appearance in response to the reconventional demand of Sabine, thus waiving the necessity of formal service of process of that demand on plaintiffs.
This suit was instituted on April 10, 1973. Sabine filed an answer and a reconventional demand on April 19, 1973, and the rule to show cause why a preliminary injunction should not issue was tried on that date.
A copy of the reconventional demand was mailed to the Honorable Tom F. Phillips, an attorney at law who was and is counsel of record for all of the plaintiffs. It was not served by the sheriff, either on the plaintiffs or personally on Mr. Phillips or on a partner or an associate of the latter, as required by LSA-C.C.P. Article 1314. Service of process of the reconventional demand thus was not made in compliance with the requirements of that article of the Code of Civil Procedure.
The case came up for trial on its merits on April 1, 1974. On that date, immediately before the trial, plaintiffs filed a declinatory exception alleging insufficiency of service of process of the reconventional demand upon the exceptors. Counsel for plaintiffs announced at that time that he would not respond to or offer any evidence with respect to the reconventional demand. The trial judge permitted the exception to be filed, but he did not rule on it at that time, and he permitted the case to go to trial solely on the issues raised by the principal demand of plaintiffs. No answer has ever been filed to the reconventional demand, and the issues presented by that demand have never been tried. The minutes of the court show that a preliminary default was entered as to the reconventional demand on August 23, 1973.
When the trial judge rendered judgment on the principal demands of plaintiffs, he also sustained the exception which had been filed by plaintiffs to the reconventional demand of Sabine. One of the questions presented on this appeal is whether the trial court erred in sustaining that exception.
Defendant concedes that service of process of the reconventional demand was not made pursuant to LSA-C.C.P. Article 1314. It contends, however, that plaintiffs have made a general appearance and thus have waived all objections to the jurisdiction of the court. It relies on LSA-C.C.P. Article 7, the pertinent part of which reads:
"Except as otherwise provided in this article, a party makes a general appearance which subjects him to the jurisdiction of the court and impliedly waives all objections thereto when, either personally or through counsel, he seeks therein any relief other than:
"(1) Entry or removal of the name of an attorney as counsel of record;
"(2) Extension of time within which to plead;
"(3) Security for costs;
"(4) Dissolution of an attachment issued on the ground of the nonresidence of the defendant; or
"(5) Dismissal of the action on the ground that the court has no jurisdiction over the defendant.
* * * * * *
"When a defendant files a declinatory exception which includes a prayer for *414 the dismissal of the action on the ground that the court has no jurisdiction over him, the pleading of other objections therein, the filing of the dilatory exception therewith, or the filing of the peremptory exception or an answer therewith when required by law, does not constitute a general appearance."
Mr. Phillips, the attorney who represents all of the plaintiffs in the instant suit, also is the attorney of record for both of the defendants in the two companion suits which have been consolidated with this one for trial and appeal.
On September 17, 1973, Mr. Phillips, in his capacity as counsel for all of the plaintiffs in the instant suit and as counsel for defendants in the two companion suits, filed a motion praying that the instant suit be consolidated for trial with the two companion suits. Pursuant to that motion, an order was signed by the district judge which reads:
"IT IS ORDERED that the cases entitled `Sabine River Authority vs. Flying Bridge Marina, Inc.', and `Sabine River Authority vs. Pendleton Bridge Marina, Inc.,' No. 26,328 and No. 26,329 on the docket of this Court, be transferred to the docket of The Honorable John S. Pickett, Jr., and consolidated for trial with the matter entitled `F. I. Wright, B. O. Red, et al vs. Sabine River Authority of the State of Louisiana', No. 26,944 on the docket of this court, separate judgments to be rendered in each."
The minutes of the court show that these three cases, including the instant suit, were consolidated for the purpose of trial on September 17, 1973. That entry was made, of course, pursuant to the motion filed in behalf of the plaintiffs and the order of court granting that motion.
Although the court ordered that the three cases be consolidated and transferred to the docket of The Honorable John S. Pickett, one of the judges of the district court, the two companion cases nevertheless came up for trial on December 11, 1973, before The Honorable Jack E. Burgess, another judge of that district court. Mr. Phillips appeared as counsel for the defendants in both of those cases, and at the beginning of the trial the following stipulation was entered into between all counsel:
"It is stipulated by and between Counsel for the Plaintiff and the Defendant in Suit, Sabine River Authority v. Flying Bridge Marina, Inc., No. 26,328, and Sabine River Authority v. Pendleton Bridge Marina, Inc., No. 26,329, that the cases be consolidated for the purposes of trial and that separate judgments be rendered in each case. Secondly, it is noted that there was filed in the records of these two cases, plus another case, F. I. Wright, B. O. Red, et al vs. Sabine River Authority of the State of Louisiana, No. 26,944 on the docket of this Honorable Court, a motion for consolidation seeking to have all three cases consolidated for the purpose of trial, with separate judgments to be rendered, in each, and that an order attached to that motion was presented to Judge John S. Pickett, Jr., to whom the F. I. Wright, B. O. Red case was assigned, and who had presided at the trial of a rule and the order of consolidation was signed.
"It is further stipulated by Counsel in this matter that both parties interpose no objection to this matter being heard; that these two cases, namely, Sabine River Authority v. Flying Bridge and Sabine River Authority vs. Pendleton Bridge Marina, Inc. being heard by Judge Burgess with the understanding that ultimately Judge Burgess and Judge Pickett will possibly determine whether or not the three cases should be finally consolidated for the purpose of decision. Both parties to this suit waive any objection to a subsequent consolidation of these two cases with the F. I. Wright, B. O. Red case and ultimate decision by Judge Pickett if either Judge, or if the Judges, determine that one rather than *415 two should render decisions in the three cases."
Although the two companion suits were tried before Judge Burgess on December 11, 1973, the judges of that district obviously decided later that all three cases, including the instant suit, should be consolidated for the purpose of decision, because Judge Pickett decided all three cases after the instant suit was tried on April 1, 1974. He assigned written reasons for judgment and signed a separate judgment in each of the three cases on July 9, 1974.
The issue presented with reference to jurisdiction is whether the act of plaintiffs in filing a formal motion on September 17, 1973, to consolidate this case with the two companion suits for trial constituted a general appearance on the part of plaintiffs in response to Sabine's reconventional demand. The trial judge held that the subsequent stipulation of counsel, on December 11, 1973, that the two companion cases be consolidated for trial before Judge Burgess, was an agreement "to vacate and set aside the essence of the previous motion to consolidate for trial," and that "any `general appearance' that might have resulted from the motion to consolidate expired with the last above referred to stipulation which abrogated said motion." The court thereupon rendered judgment sustaining the exception of lack of adequate service of process.
We think the trial judge erred in holding that plaintiffs had failed to make a general appearance in the suit.
The motion filed by all of the plaintiffs to consolidate this case with the two companion suits constituted a demand for relief in the instant suit, and the relief sought was not one of the five types of relief which are listed in LSA-C.C.P. Article 7. Defendant's reconventional demand was filed almost five months before the motion to consolidate was filed. Counsel for Sabine had written to counsel for plaintiffs twice, on June 22 and again on August 2, 1973, requesting that the latter file an answer to the reconventional demand, and Sabine entered a preliminary default on the reconventional demand on August 23, 1973. In the motion to consolidate filed by plaintiffs on September 17, 1973, there was no suggestion that the consolidation was to be limited to the principal demand, or that it was not to include the reconventional demand. We think the filing of that motion constituted a general appearance in response to the reconventional demand.
In our opinion the motion to consolidate filed by plaintiffs on September 17, 1973, was not "abrogated" by the stipulation which was entered into on December 11, 1973, in the two companion suits. It is unnecessary for us to determine whether a party can abrogate or rescind a general appearance and waiver of service of process after such a general appearance has been made, because we find that in this case the parties did not abrogate, rescind or waive the earlier motion and order. On the contrary, we think the last stipulation confirms the earlier action which resulted in a consolidation of all three cases. The stipulation recites that both parties "waive any objection to a subsequent consolidation" of the two companion suits with the instant case. At most, the stipulation entered into in December merely modified the earlier order of consolidation.
We conclude that plaintiffs made a general appearance in response to Sabine's reconventional demand, that in doing so they waived all objections to the jurisdiction of the court, and that the trial judge erred in sustaining the exception to the jurisdiction of the court filed by plaintiffs.
The issues presented by the allegations in the reconventional demand are not before us, because there has been no trial of the reconventional demand. That part of the judgment of the trial court which sustains the exception filed by plaintiffs to the reconventional demand will be reversed, therefore, and the case will be remanded to the trial court for a proper disposition of the reconventional demand.
*416 We think plaintiffs should be allowed a reasonable time within which to file answers or other pleadings in response to the reconventional demand.
Our ultimate conclusion is that the trial judge erred in granting plaintiffs the injunctive relief which they sought, and in sustaining the exception to the jurisdiction of the court, based on the lack of proper service of process, filed by plaintiffs to Sabine's reconventional demand.
For the reasons herein set out, the judgment appealed from is reversed, and judgment is hereby rendered in favor of defendant, Sabine River Authority of the State of Louisiana, and against plaintiffs, rejecting plaintiffs' demands at their costs. Judgment also is rendered overruling the exception filed by plaintiffs to defendant's reconventional demand, based on allegations of lack of adequate service of process of the reconventional demand on plaintiffs, and remanding the case to the trial court for further proceedings consistent with the views herein expressed.
The costs of this appeal are assessed to plaintiffs-appellees.
Reversed and remanded.
MILLER, J., concurs and assigns written reasons.
WATSON, J., dissents and assigns written reasons.
MILLER, Judge (concurring).
I would not hold that defendant's fees and charges are regulatory matters, but would limit our decision to hold that plaintiffs failed to meet their burden of proving the fees and charges to be taxes. I respectfully concur.
WATSON, Judge (dissenting):
Plaintiffs, Jim W. Long, O. D. Hicks, Wimpy Thiels, B. R. Harvey, Jerry Brown, Kenneth Sebren, James L. Guillet, Jack H. Green, Conald E. Conley, Jessie Pady, K. C. Bray, John J. Mathieu, William Hovermale, F. I. Wright and Bruce Odell Red, filed suit against defendant, Sabine River Authority of the State of Louisiana, alleging that plaintiffs are riparian owners of property abutting the Sabine River. Plaintiffs' property was transferred to the Sabine River Authority, which leased it back to plaintiffs for a period of ninety-nine years. Plaintiffs alleged that they have constructed improvements on their respective leased properties and charge the public for the use of these facilities. Plaintiffs further alleged that defendant has consented to their commercial operations by its past failure to object to them. Plaintiffs also alleged that defendant has attempted to assess charges, fees, and rentals on the facilities constructed by plaintiffs and asked that defendant be enjoined from imposing such charges, plaintiffs alleging that defendant has no legal right to tax plaintiffs and such charges amount to taxation.
Defendant, Sabine River Authority of the State of Louisiana, filed a recoventional demand against plaintiffs, asking that judgments be rendered for past due fees, charges, rates and/or rentals due under the commercial use permits held by plaintiffs. In the alternative, the Sabine River Authority asked that the leases between plaintiffs and defendant be declared null and void, either because of plaintiffs' active breach of the terms thereof or as contrary to the laws of the State of Louisiana, in particular LSA-R.S. 41:1217.[1] The provision *417 of the leases allegedly breached by plaintiffs is as follows:
"LESSEE shall not have the right to make any commercial use of said property without the written consent of AUTHORITY."
Plaintiffs did not file an answer to defendant's reconventional demand. Plaintiffs filed a declinatory exception to the reconventional demand on the basis of insufficient service of process. This exception was sustained by the trial court. Therefore, the trial court did not consider the reconventional demand.
On the merits, the trial court granted the injunction requested by plaintiffs, prohibiting defendant from imposing any schedule of fees or charges for plaintiffs' use of the land leased from defendant. Defendant was also enjoined from denying plaintiffs the right to charge for the services and facilities constructed by them.
Defendant, Sabine River Authority, has appealed, contending that the trial court erred in sustaining plaintiffs' exception to defendant's reconventional demand in granting plaintiffs the injunction.
In regard to the exception, defendant-appellant, Sabine River Authority, does not contend that there was a valid service of process of defendant's reconventional demand on plaintiffs, but rather that plaintiffs waived the requirements of valid service by a general appearance. Counsel for defendant contends that the motion for consolidation filed by plaintiffs herein on September 17, 1973, constitutes a general appearance sufficient to waive service of process, citing Conino v. Landry, 222 So.2d 525 (La.App. 4 Cir. 1969); writ denied 254 La. 767, 770, 226 So.2d 524, 525. The trial court held that this motion for consolidation did not constitute a waiver of service because it was vacated and abrogated by a stipulation between the parties on December 11, 1973, wherein it was agreed that the ultimate determination as to consolidation be made by the hearing judges. As a result of this stipulation, Sabine River Authority, State of Louisiana vs. Pendleton Bridge Marina, Inc., docket no. 4757, and Sabine River Authority, State of Louisiana vs. Flying Bridge Marina, Inc., docket no. 4768, were consolidated and tried before Judge Jack E. Burgess on December 11, 1973. The instant case was re-fixed for trial on April 1, 1974 and was heard by Judge John S. Pickett, Jr. on that date. On April 1, 1974, the plaintiffs in the instant case filed the declinatory exception in connection with the reconventional demand. The trial court distinguished between an appearance as to a main demand and an appearance as to a reconventional demand, citing Johnson v. Robottom's Mortuary, *418 258 So.2d 666 (La.App. 4 Cir. 1972). In that case, as the trial court here correctly pointed out, it was held that a party can appear for purposes of a main demand without waiving service of process as to a third party demand. Herein, plaintiffs stated that they were proceeding to trial on the issues raised in the main demand and answer and would not participate in any matters related to the purported reconventional demand. Therefore, the trial court held that there was no general appearance in connection with the reconventional demand sufficient to waive the legal requirements for service of process. I find that the holding of the trial court was correct on this issue.
Likewise, I believe the trial court correctly ruled on the principal demand and I will quote the reasons assigned:
"* * *
"At the time the Sabine River Authority acquired land to be used for the impoundment of the waters of the proposed reservoir, to be known as Toledo Lake, said land was acquired by it up to the 175 foot MSL contour. The normal pool stage of the Lake was to be 172 feet MSL. The area between the 172-foot contour and the 175-foot contour, or a minimum of 50 feet, landward from the 172-foot contour is known as the `leaseback' area. This area, with fee title vested in the Sabine River Authority, was `leased back' to the original owner from whom it was acquired, and who had lands owned in fee abutting this `leaseback.' The leaseback agreement is for a period of 99 years. See P-8.
"The Lessee, his heirs and assigns were granted numerous rights under the provisions of this agreement, but the provision that is relevant to the issues in the instant case relate to that provision of the contract, found on the second page, line 20, which is as follows:
`Lessee, shall not have the right to make any commercial use of said property without the written consent of Authority.'
"In 1967, the Sabine River Authority established certain regulations concerning activities on the lake but did not commence implementing a permit policy as to commercial operations until 1970. At that time it began requiring the commercial operators to obtain permits for commercial operation, the terms of which included the schedule of rates and charges which is being contested in this proceeding. These charges include an assessment on a per-foot basis for docks and floating boathouses; a charge based upon the linear frontage of the leaseback; fixed fees for particular type operations and a charge of 2% of the gross receipts of businesses and operations conducted on the `leaseback' area.
"The plaintiffs contend that the charges and fees attempted to be exacted from them are illegal on three bases:
1. The fees and charges amount to a levy of taxes, and the Sabine River Authority has no power to tax under the provisions of LRS 38:2324.
2. Alternatively, the fees and charges are imposed as rent under the leaseback agreements, and rent for the full term of the lease having already been paid, the sums are not due and cannot be collected.
3. The charges and fees attempted to be imposed cannot be justified as payment for services or facilities furnished by the Sabine River Authority.
"Defendant concedes that it has no power to tax. But Defendant urges that its fee schedule is not a tax levy, but is and has been authorized by Section F of R.S. 38:2325, and that R.S. 38:2331 states that the Authority shall have the power to adopt and promulgate all reasonable regulations to secure and maintain... all recreational and business privileges along or around the reservoir.
*419 "L.S.A.-R.S. 38:2325, Section F, provides:
`Said Authority shall have the power:
. . . . . .
(f) To fix, maintain, collect and receive rates, charges, and rentals for the facilities of the Authority and the services rendered thereby.
. . . . . ."
"L.S.A.-R.S. 38:2331 provides:
`The board of commissioners for the Authority shall have the power to adopt and promulgate all reasonable regulations to receive, maintain and preserve the sanitary conditions of all waters in and to flow into any reservoir owned by the Authority, to prevent waste of water or the unauthorized use thereof, to regulate residence, hunting, fishing, boating and camping and all recreational and business privileges along or around any such reservoir, the Sabine River and its tributaries.'
"Thus, it is obvious to this Court that the Sabine River Authority has the power to regulate recreational and business privileges along or around the reservoir, and that it has in fact established such regulations covering, at least to some extent, the purposes set forth in L.S.A-R. S. 38:2331. The plaintiffs in this suit, as commercial operators, are among those whose said businesses are to be so regulated.
"However, the Sabine River Authority is without the power to impose any fee, charge, rate or rental, or any schedule of fees, charges, rates or rentals against these plaintiffs for the reason that the power to `fix, maintain, collect and receive rates, charges and rentals', as provided in L.S.A.-R.S. 38:2325, Section F, is confined to such charges being made `for the facilities of the Authority, and the services rendered thereby.'
"In the instant case the Plaintiffs are not using any facilities belonging to the Authority. On the contrary, it is not disputed that the Plaintiffs are using facilities owned by themselves and that the Authority rendered no financial assistance whatsoever in the construction of the facilities. It is also undisputed that the Authority has rendered no service whatsoever to these Plaintiffs.
"The Court suggests that perhaps the provisions of L.S.A.-R.S. 38:2325, Section F, cited and quoted hereinabove, was intended to refer to L.S.A.-R.S. 38:2333, which provides:
`The Authority is authorized to establish or otherwise provide for public parks and other recreational facilities and to acquire land for such purposes.'
"Certainly it would appear logical, and therefore with Legislative intent, that if the Authority expended funds for, and actually made recreational facilities available, then the Authority, under L.S. A.-R.S. 38:2325, Section F, could make charges for the use of same.
"In any event it is clear to this Court that the Authority has the power to regulate plaintiffs' business operations along the lake, but that it does not have the power to impose charges, fees, rates or rentals, and that those presently attempted to be imposed are unauthorized and therefore illegal.
"The evidence is also clear that the Sabine River Authority, even though it promulgated regulations in 1967, did not attempt to implement them until 1970, and that during the interim it permitted, with full knowledge, and sufferance, and without written permission, the establishment by these plaintiffs, and others, of commercial operations along the shores of the Lake, including use of the `leaseback' area for commercial purposes." (TR. 260-263)
*420 Highly significant is the fact that each leaseback agreement provides that "no additional consideration" shall be charged for granting other rights to the lessees, but that is exactly what the majority is allowing the Authority to do. In other words, after paying 75% of the purchase price for the leaseback, the plaintiffs are now saddled with large additional charges which were specifically prohibited by the leaseback agreement.
Lending further support to the trial court's decision, now reversed, is the action of the Louisiana Legislature which, in 1974, amended LSA-R.S. 38:2324 by Act No. 453 reading in pertinent part as follows:
"The Sabine River Authority .... shall not have the power to levy taxes but it may assess and collect charges, fees and rentals for the use of its lands or water bottoms and for the construction, installation, maintenance and operation on such lands or water bottoms, or on the surface of any lake or reservoir owned by it or in which it has an interest, any wharf, dock, boathouse, pier, marine, shop, store, gasoline dispenser or other commercial establishment...."
As of its effective date, July 12, 1974, the 1974 amendment to the statute gives the Sabine River Authority the right to levy the fees it claims in these lawsuits. Since the amendment to the statute enlarges the powers of the Authority, it seems clear to me that the Sabine River Authority did not have the right to levy such fees prior to the effective date of the legislation.
There is no reason to conclude that the statute is retroactive. The question of fees and charges under the new legislation is not before us and I would pretermit any questions concerning the validity of Act 453 or charges under it.
For these reasons I disagree with the conclusions of the majority. The actions of the Sabine River Authority are outside the powers granted (at least prior to 1974) by the legislature. Serious questions as to constitutional violations are presented by the taxing of the leaseback holders to attempt to raise money for the Authority. The charging of taxes disguised as fees is clearly in violation of the original leaseback agreements. And the charging of fees to the leaseback holders but not to any other persons, who use the same facilities and enjoy the identical services, is manifestly discriminatory.
For these reasons I respectfully dissent. I would affirm the trial court.
NOTES
[1] LSA-R.S. 41:1217:

"A. All leases executed under the provisions of this part shall be for a period not exceeding ten years and shall provide for an annual rental of not less than one dollar per acre, which shall be pavable in cash annually and in advance; provided, however, that any person who leases such land and who, within the ten year term of the lease, or any person who holds a ten year lease in full force as of the date of passage of this Act, adds or contracts for permanent improvements to be constructed or placed on or made to the land in the amount of not less than two thousand dollars may, upon written notification to the lessor and upon a proper showing that such improvements have in fact been made or contracted for, lease such lands for an additional period of not more than ten years, the payment of rentals therefor to be made as hereinabove stated. However, if the lease provides for the addition or construction of improvements on or to the land to a value in excess of one hundred thousand dollars and that such improvements at the termination of the lease, will become the property of the lessor without any cost to the lessor, then the lessor may grant an option to the lessee to extend the primary term of the lease for an additional ten-year period, or part thereof, for each one hundred thousand dollars worth of improvements or additions made on or to the land for not to exceed a maximum term of sixty years.
B. The failure of the tenant to pay the rent punctually or before the date upon which the rental falls due, shall ipso facto and without demand or putting in default terminate and cancel the lease. In such event the lessor, through the attorney general of Louisiana, may take such legal steps as are necessary and appropriate under the law to cancel the lease from the records of the parish in which the land is located, to evict the tenant or tenants refusing to leave the grounds leased and to recover monies due the lessor for past due rentals and damages for lost rentals occasioned by the tenants. Improvements placed on the property leased shall be subject to seizure and sale by the lessor, through the attorney general, in order to satisfy the lessor's claim for monies and/or damages owed by delinquent tenants.
C. The provisions of this section shall not apply to port authorities of this state."