Dear Mr Pratt:
You have requested an opinion from this Office pertaining to property issues of the Sabine River Authority (SRA). Particularly, you raise the following issues regarding certain lease-back agreements burdening property owned by SRA and the structures thereon that are either abandoned by the lessees or in disrepair:
1. Do the lease-back agreements operate as predial servitudes?
2. Do encroachments of habitable structures or sewerage facilities on the lease-back land establish predial servitudes?
3. Can SRA dissolve the lease-back agreements?
4. If the lease-back agreements can be dissolved, can SRA then remove the encroachments and require the owner or the permittee to pay the costs of removal?
5. Does SRA have the right to resurvey the lease-back areas in situations where the lease has been assigned to someone other than the original lessee?
6. How might SRA enter into new lease-back agreements with the current adjacent landowners?[1] *Page 2 
HISTORY:
SRA was created as an agency of this state by Act 261 of 1950.[2] Pursuant to the power vested in it by that statute, SRA acquired title to all lands in Louisiana that later were inundated by the Toledo Bend Reservoir, and also to all property surrounding the Toledo Bend Reservoir lying between the contour of 172 feet above mean sea level (msl) and the contour of 175 feet msl, or a distance of 50 feet running horizontally from the 172-foot contour, whichever is greater.[3] Although SRA owned the above-described strip of land extending landward at least 50 feet from the 172-foot contour, its policy was to lease back to the abutting landowner that part of the strip that extended from the shore of the reservoir to the landowner's property. That strip of land around the edge of the reservoir, 50 feet or more in width, was known as the "lease-back" area. This strip of land is subject to inundation. See Wright v. Sabine River Authority,308 So.2d 402 (La. App. 3 Cir. 1975).
FACTS PROVIDED BY SABINE RIVER AUTHORITY OF LOUISIANA:
Through conversations with you and your office, we are informed of the following pertinent facts. A survey was conducted at the beginning of the Toledo Bend Project to determine which lands were to be purchased and said survey established what is known as the Guide Taking Line. This "taking line" approximates the 175.0' msl contour. This surveyed line was used to describe property that was purchased to build the reservoir. The survey also established the top of the pool level, which is the 172.0' msl contour. The survey contract required the surveyors to plot both lines (172.0' and 175.0') and compute the acreage, for both the land to be purchased for inundation and the lease-back land. On the original survey plats, on deeds that were written to purchase the properties, and in lease-back agreements, this survey is referred to numerous times. In most cases, when property was purchased from the original land owner, a lease-back agreement was also executed that leased the area indicated on the survey between the shown 172.0' contour and the 175.0' contour back to that original owner for a maximum of 75% of the purchase price per acre of the property. The lease-back agreement allows the original owner to use this leased property, but specifically prohibits habitable structures or sewerage facilities in the lease-back area. This provision was intended to protect the integrity of the reservoir and to allow adjacent property owners access to the reservoir. These original lease-back agreements were for a period of 99 years and will expire in or around the year 2064. In many areas of the reservoir, especially near the heads of drainages and in gently sloping areas on the North end of the reservoir, there are large areas that, although owned by SRA, are not inundated with water except in flood or high water events. These areas are not included in the lease-back agreements. *Page 3 
ISSUE ONE: Do the lease-back agreements operate as predialservitudes?
A predial servitude is defined as ". . . a charge on a servient estate for the benefit of a dominant estate. The two estates must belong to different owners." La.C.C. Art. 646. Comment (b) to Article 646 further explains,
The definition indicates that predial servitudes are real rights burdening immovables, that the creation of these rights requires the existence of two distinct immovables, belonging to different owners and that these rights are for the benefit of an immovable rather than a person.
Further, La.C.C. Art. 646, Comment c, notes that:
. . . According to modern analysis, however, things cannot have rights; rights belong to persons only. Therefore, legislative declarations in Louisiana. . . that predial servitudes are due to an estate must be taken as metaphors; they merely mean that predial servitudes are not attached to a particular person but that they are due to anyone who happens to be owner of the dominant estate.
The lease-back agreements are not predial servitudes. If a predial servitude had been contemplated, it could have easily been agreed to. It was not. For the purposes of this opinion, we assume that the lease-back agreement is a valid ninety-nine (99) year lease. It is well settled in Louisiana jurisprudence that leases are classified as contracts establishing personal rights and obligations.[4]
While the lease-back instrument does contain certain predial rights that can be leased, the lease-back is a limited personal contract to exercise the rights stipulated and agreed to in the lease-back agreement. You have explained that all of the lease-back agreements were in the names of specific individuals and, although it was originally contemplated that the lessee must be the owner of the land abutting the Guide Taking Line, this requirement is not specified in the terms of the lease-back agreement that you have provided. Likewise, in the document that you provided, there is also no requirement that the lease be assigned if the original lessee sells his or her property. If the person currently living on the abutting property is not the original lessee, that person did not lease the lease-back property and (unless the lease was assigned to the current owner) cannot enjoy the rights under that lease nor be charged with a breach of any of the obligations in that lease. The lease-back is a personal obligation granted for the lessee and not a right granted in favor of the neighboring estate, therefore it is not a predial servitude. *Page 4 
Therefore, a predial servitude is not a personal right. This means that it does not matter who the person is who has the servitude because a servitude is granted for the benefit of the estate regardless of the person who happens to own the estate. It is clear from our review of the law and the documents that you have provided that the lease-back agreements do not constitute charges on the servient estate, but are assignable personal rights in favor of the lessee, and are thus not property classified as predial servitudes.
Under the terms of the last paragraph of the lease-back agreement, SRA has a right to dissolve the lease for the failure of the lessee to comply with any condition of the agreement. The last paragraph of the lease provides, in pertinent part,
The failure to do so and /or the failure to comply with any other condition hereof shall constitute grounds for the dissolution of this lease upon the continued failure to comply after sixty (60) days written notice by AUTHORITY to LESSEE at the address shown above.
Therefore, if SRA believes that the lessee has breached the lease-back agreement, the SRA may enforce this paragraph.
ISSUE TWO: Do encroachments of habitable structures orsewerage facilities on the lease-back land establish predialservitudes?
According to the facts you have provided, there have been no contractual predial servitudes granted on the lease-back property of SRA. Predial servitudes on property of the State or one of its political subdivisions may not be acquired by prescription; they must be established by title. See La.Const. Art. 12 § 13 and La.C.C. Art. 458. Because SRA is one such political subdivision, this provision applies. La.R.S. 38:2321, et seq. Consequently, the presence of the encroachments cannot establish a predial servitude on public property.
If the present landowners are not the original lessees, they may have no lease, and therefore no rights whatsoever to use the property unless they acquire a contractual predial servitude. A predial servitude may be established on public things, including property of the State, its agencies, and political subdivisions. See La.C.C. Art. 723. Therefore, the SRA could enter into contractual predial servitude agreements with the adjacent landowners instead of or in addition to the lease-back agreements. The previous statement contemplates that the lease-back agreements would allow for such an arrangement and that the rights in each would not conflict.[5] In addition, if the original *Page 5 
lease-back agreements have been dissolved due to a breach, the SRA would be free to enter into servitude agreements on property previously covered by these agreements.
If the lease-back agreement has been breached by the lessee, and if SRA does grant a contractual servitude to the present landowner, the servitude could allow for the landowner to apply for the permit to erect facilities. Alternatively, it might be prudent to ask the present lessee to amend the lease to add a right of assignment so that the lessee can assign the lease-back to the present landowner.
ISSUE THREE: Can SRA dissolve the lease-back agreements?
Under the terms of the lease-back agreements, SRA has a right to dissolve them if the lessee has breached the provisions of the lease-back. Evaluation of the facts of whether or not a breach has occurred is beyond the scope of this opinion and is better left to a court of competent jurisdiction. However, with regard to the terms of the lease, we note that the last paragraph of the lease provides, in pertinent part,
The failure to do so and/or the failure to comply with any other condition hereof shall constitute grounds for the dissolution of this lease upon the continued failure to comply after sixty (60) days written notice by AUTHORITY to LESSEE at the address shown above.
Thus, although each factual scenario must be independently evaluated to assess whether a breach has occurred, the finding of a breach would clearly allow SRA to dissolve the lease-back agreement.
ISSUE FOUR: If the lease-back agreements can be dissolved,can SRA then remove the encroachments and require the owner or thepermittee to pay the costs of removal?
With regard to removal of the buildings on the leased property, because there is no provision in the lease-back agreements regarding removal of the buildings, we must look to the Civil Code. La.C.C. Art. 2695 is applicable to this situation. That article states:
In the absence of contrary agreement, upon termination of the lease, the rights and obligations of the parties with regard to attachments, additions, or other improvements made to the leased thing by the lessee are as follows: *Page 6 
(1) The lessee may remove all improvements that he made to the leased thing, provided that he restore the thing to its former condition.
(2) If the lessee does not remove the improvements, the lessor may:
(a) Appropriate ownership of the improvements by reimbursing the lessee for their costs or for the enhanced value of the leased thing whichever is less; or
(b) Demand that the lessee remove the improvements within a reasonable time and restore the leased thing to its former condition. If the lessee fails to do so, the lessor may remove the improvements and restore the leased thing to its former condition at the expense of the lessee or appropriate ownership of the improvements without any obligation of reimbursement to the lessee. Appropriation of the improvement by the lessor may only be accomplished by providing additional notice by certified mail to the lessee after expiration of the time given the lessee to remove the improvements.
(c) Until such time as the lessor appropriates the improvement, the improvements shall remain the property of the lessee and the lessee shall be solely responsible for any harm caused by the improvements.
Comments (d) and (f) to La.C.C. Art. 2695 explain that provision well:
(d) The phrasing and arrangement of Civil Code Article 2695 (Rev. 2004) make clear that the first option in determining the fate of the improvements upon termination of the lease belongs to the lessee. In the absence of a contrary agreement: (a) the lessee has the right to remove the improvements, even if he had made them without the lessor's consent; and (b) the lessor may not prevent their removal, even if they were made with his consent. Depending on the circumstances, the making of improvements without the lessor's consent may amount to a breach of the lessee's obligations under Civil Code Articles 2683(2), 2686, or 2687 (Rev. 2004) and if so the lessor has the remedies available through those articles. But at the termination of the lease, restoration of the thing to its former condition is also one of the lessee's obligations under Civil Code Article 2683(3) (Rev. 2004) and removal of the improvements is a means of discharging that obligation. Conversely, in the absence of a contrary agreement, the fact that the lessor consented to the making of the improvements does not deprive the lessee of the right to remove them, or the lessor of the right to force their removal at the end of the lease.
Comment (f) further explains the next step:
If the lessee does not exercise his right to remove the improvements, *Page 7 
then, again in the absence of contrary agreement, the lessor gets to exercise the two main options provided in subparagraph (2) of Civil Code Article 2695 (Rev. 2004), namely: (a) appropriate ownership of the improvements by reimbursing the lessee for their costs or for the enhanced value of the leased thing, whichever is less; or (b) demand that the lessee remove the improvements within a reasonable time and restore the thing to its former condition. If the lessee fails to do so, the lessor gets two further options: (i) have the improvements removed and the thing restored to its former condition at the expense of the lessee; or (ii) appropriate ownership of the improvements by providing notice to the lessee. In the latter case, the lessor owes no reimbursement to the lessee.
Additionally, it is true that a permit may be revoked according to the terms of the permit. As with the interpretation of the facts constituting a breach of a lease-back agreement, evaluation of the facts of whether a violation of the permit has occurred is beyond the scope of this opinion. That evaluation of the facts is better left to a court of competent jurisdiction to decide within the parameters of a declaratory judgment action. Further, if the buildings, structures or other works were built without a permit, La.C.C. Art. 458 provides:
Works built without lawful permit on public things, including the sea, the seashore, and the bottom of natural navigable waters, or on the banks of navigable rivers, that obstruct the public use may be removed at the expense of the persons who built or own them at the instance of the public authorities, or of any person residing in the state. The owner of the works may not prevent their removal by alleging prescription or possession.
Therefore, pursuant to the terms of the lease-back agreements and any permits issued by SRA, in addition to dissolution of the lease-back agreement if there is a breach, the SRA can require removal of structures at the expense of the lessee, permitee, or other person who placed the structures on the land if the structures violate the terms of the lease-back agreement or the permit. The SRA can also require such removal if there was no permit for the existing structures.
ISSUE FIVE: Does SRA have the right to survey its ownproperty?
Your staff has explained that some SRA properties have been sold and the lease-back agreements have been assigned to the current adjacent property owners. An issue arises when the adjacent properties have been divided and sold in lots narrower than the original lot. In some of those situations, these new deeds do not divide the lease-back area, but instead simply refer to the entire lease-back. In these cases, if the lease-back agreement has been assigned to the current landowners, the SRA would have to *Page 8 
request an amendment to the lease-back agreement to allow for a re-survey thus incorporating only the portion of the original lease-back area that is directly adjacent to the new owner's property and within the continued property lines as projected to the water's edge. The lease holder would have to agree to such an amendment.
CONCLUSION:
Due to the complexity of this opinion, we here recapitulate the major conclusions.
1. The presence of leases, encroachments, and facilities does not create predial servitudes on public property;
2. If the facts prove that there has been a breach of a lease-back agreement, SRA may take action under the terms of the lease or any applicable law to dissolve the agreement;
3. If the facts support such action, SRA may also remove or force removal of unauthorized buildings and encroachments at the cost of the lessee;
4. If there has been no permit to build on the lease-back area, or if the facts show there has been a violation of a permit issued by SRA, SRA may revoke the permit and remove or force removal of unauthorized buildings and encroachments at the cost of the permittee;
5. Following valid dissolution of a lease-back agreement, SRA, in its discretion, may enter into contractual predial servitudes with the new adjacent landowners and re-survey the portion of SRA property covered by the new servitude.
We trust that this analysis adequately responds to your request. Should you have any further questions or concerns, please do not hesitate to contact this Office.
Sincerely,
JAMES D. "BUDDY" CALDWELL ATTORNEY GENERAL
BY: __________________________ IRYS L. V. ALLGOOD Assistant Attorney General
JDC/ILVA/jv
[1] In subsequent discussions you asked that we include a recommendation for entering new lease-back agreements with the current adjacent landowners.
[2] La.R.S. 38:2321, et seq.
[3] Id.
[4] See Leonard v. Lavigne, 162 So.2d 341 (La. 1964);Harwood Oil Mining Co. v. Black, 124 So.2d 764 (La. 1960);Reagan v. Murphy, 105 So.2d 210 (La. 1958); Calhoun v. GulfRefining Co., 104 So.2d 547 (La. 1958); Gulf RefiningCo. v. Glassell, 171 So. 846 (La. 1936). E.P. Dobson,Inc. v. Perritt, 566 So.2d 657 (La. App. 2Cir.1990).
[5] Such a determination will be dependant upon the lease-back terms and the contemplated use under the servitude. As noted above, the lease-back agreements specifically prohibit some things (e.g., structures and sewerage lines). Thus, a servitude for such purposes would conflict with the lease-back agreement. Although this Office will not opine as to what else would and would not constitute a breach of the lease-back agreements, we can envision that some servitudes may be crafted to be harmonious with the lease-back agreements.