On Motion to Dismiss.
 

 ST. PAUL, J.
 

 Appellees (plaintiffs) move to dismiss the appeal herein taken by defendants on the ground that the court below (First judicial district court) “is a court of record, and that no
 
 written
 
 motion for an appeal in this cause was made or filed by the defendants herein.”
 

 The minutes of the court below recite that—
 

 “Oral motion for appeal [was] made by defendants; appeal devolutively granted, returnable to the Supreme Court,” etc.
 

 I.
 

 In plaintiffs’ brief on
 
 the motion to
 
 dismiss it is said that the Constitution declares that district courts shall be
 
 courts of record
 
 (Const. 1921, art. 7, § 35), and “therefore there must be a record, which means a
 
 written
 
 record of all proceedings had in the district courts.” All. of which is quite correct; for the clerk of court is required by law (C. P. 775, 779) to keep a record of all proceedings had before the court, consisting of (1) the file, C. P. 176, 779, 585; (2) the docket, or entry book, C. P. 776; and (3) the minute book, C. P. 777, 544.
 

 II.
 

 And thereupon appellees argue a nonsequitur, to wit, that since there can be no record of a verbal motion
 
 other than the fact that such motion was made,
 
 therefore there can be no such motion.
 

 
 *517
 
 Which, of course, is simply begging the question as to how the record shall be kept of the motions, made by the parties; i. e., whether the record of such motions belongs in the “file” or in the “minutes.” And the answer is that such motions belong in the minutes and need not be in writing, since the law does not
 
 require
 
 that they be reduced to writing and “filed” (as it does for pleadings, C. P. 171, 176, 317), but only that they be entered on the minutes. C. P. 777, 573, 574; Theriot v. Michel, 28 La. Ann. 107; Gaidry v. Lyons, 29 La. Ann. 4; Knoll v. Knoll, 114 La. 704, 38 So. 523.
 

 Accordingly motions made in open court and the orders thereon granted need not be in writing and filed, unless the
 
 rules of court
 
 require that they should be; for the courts hare authority to establish such a rule. C. P. 145. Cf. 42 C. J. 464; 19 R. C. L. 672.
 

 Decree.
 

 The motion to dismiss is therefore denied.
 

 On the Merits.
 

 The opinion of the district judge covers the case fully and correctly, and we adopt it as our own, as follows:
 

 Opinion of the District Judge.
 

 This suit is brought by W. A. Anderson, as president of the Civic League, and various taxpayers of the city of Shreveport, seeking to enjoin the city through its mayor or council from erecting a public auditorium on 10-acre lot 7 of said city, known as Princess Park, on the following grounds:
 

 (1) That in selecting said site the council unlawfully rejected and disregarded the advice and assistance of an advisory commission appointed by said council to aid and assist in the selection of a site.
 

 (2) That the ordinance and ballot authorizing the election for an auditorium provided also for the purchase of a site, and the council is without right to expend all of the fund on the construction of the building.
 

 ' (3) That the location is wholly unsuited for an auditorium site; that the action of the council in selecting it is arbitrary and in violation of the rights of petitioners.
 

 (4) That the city in its purchase of said 10-acre lot acquired only a servitude, limiting its use to that óf a public park; that its diversion to another use would result in a forfeiture of said servitude, and a loss to the city of its entire interest in said lot.
 

 (5) That having accepted the dedication of said lot as a public park, and having used same as a public park for more than 50 years, and having expended large sums of money on the improvements of said lot for park purposes, said lot being still needed and used as a public park, the council is without authority to now divert it to any other use; that the erection of the proposed auditorium on said lot would destroy its usefulness as a park.
 

 L Taking up the allegations in the above order, we find that by Resolution No. 28 of 1927, the city council provided that an advisory commission be created for the purpose of advising and assisting the city council in the selection of a place and the expenditure of funds for the construction of the proposed municipal auditorium; that pursuant to said resolution on March 22, 1927, a commission composed of Andrew Querbes, George M. Hearn, George W. Swallow, E. A. Conway, and Col. D. W. Spur-lock was appointed as an advisory committee to confer with the city council in regard to the selection of an auditorium site and plans for said auditorium.
 

 In the first place, the responsibility and duty of selecting a site for a public auditorium to be erected by the city of Shreveport rests upon its governing body, the city council, duly elected for such purposes by the citizens of the municipality. Even if it had attempted to do so, the council is without power to delegate its discretionary and legislate duties to some other body or commission of citizens. The council has the right to appoint advisory commissions and to seek the aid, advice, and assistance of such commission, but the function of such commission is, as the words used imply, wholly advisory. Its advice is not binding upon the council, and may be either adopted or rejected as the council sees fit.
 

 In this ■ case the very resolution authorizing said council, and the further resolution appointing same, contain the express stipulation that such committee is an advisory committee appointed for the purpose of advising and assisting the council. It will be seen that there was no delegation of the council’s authority real or intended. Therefore this contention is without merit.
 

 II. In regard to the second contention, it is true that Resolution No. 2 of 1927 proposing to incur debts and issue bonds for certain purposes, provided in section G as follows:
 

 
 *519
 
 “To incur debts and issue bonds of the city of Shreveport to the amount of $500,000 * * * for the purpose of purchasing the necessary real estate and erection of a municipal auditorium within the city 'of Shreveport as a memorial
 
 to our
 
 soldiers of the World War, and same to be the property of the city of Shreveport and the citizens thereof.”
 

 We,are of the opinion that the main object of this section was to provide for the erection of a municipal auditorium, and that the authority given in said section for the purchase of real estate was merely incidental to the carrying out of the main object. We are of the opinion that the words “if necessary” should be read into the section before or after the words “for the purchase of necessary real estate,” and that the word “necessary” in itself implies that the purchase of a site was not intended to be mandatory. Any other construction would be entirely unreasonable. Why should the city purchase a site and expend considerable sums of money therefor if a suitable site can be legally obtained without such expenditure. We think this contention also is without merit.
 

 III. We will not attempt to digest the great mass of testimony pro and eon concerning the suitability of Princess Park as a site for the location of a public auditorium. The court is not concerned with the question of the comparative merits of the various sites suggested.
 

 As stated above, the power to select a site is vested in the duly elected council of the city of Shreveport. Our government, both municipal, state and federal, is divided into three branches —executive, legislative, and judicial. The judicial branch of the government is only concerned with the actions of the legislative branch when such actions are contrary to law, ultra vires, fraudulent or so arbitrary as to constitute an abuse of discretion, a waste of public funds, and a fraud upon the citizens and taxpayers.
 

 It is conclusively shown that Princess Park occupies an entire city block. The land rises gradually from the abutting streets to form a considerable mound or knoll in the approximate Center. It is attractively landscaped and ornamented with trees and shrubbery. Outside the question of location it is eminently suited for an auditorium site.
 

 As stated above, we are not called upon to decide whether or not it is the best location for a public auditorium. We find that any downtown location is confronted with serious traffic problems. We are not prepared to say that traffic problems affecting Princess Park are so serious as to render it entirely unfit for an auditorium site. It is true that the location is not accessible to the • downtown or business section as the Pannin street location, but, on the other hand, it is within a few blocks of the downtown section, and is more accessible to the outlying or residential sections of the city, in that conveyances coming from such sections will not be compelled to pass through the downtown lights and traffic. Nor do we find that the presence of negro houses on two sides of the proposed square renders it unfit as an auditorium site. If such residences do not interfere with its use as a public park to be enjoyed by the children, ladies, and citizens of Shreveport, we are unable to see why their presence should unduly interfere with its use as an auditorium site. Nor do we find the various other objections advanced by the many witnesses in opposition to its selection, of a character só serious as to render it wholly unfit for the purposes proposed. We therefore, as stated above, without expressing any opinion as to the comparative merits of the various sites, are of the opinion that the site is not so objectionable as to render its selection entirely arbitrary and unreasonable. Particularly is this so when it is remembered that by selecting this site some $90,000 is saved, making it possible to build that much better edifice and more beautiful memorial.
 

 IV. The property in question was purchased by the city, represented by its mayor, and duly authorized by resolution of its board of trustees on the 30th day of May, 1870, at succession sale in the matter of the Succession of Samuel Bennet, No. 489 on the docket of the parish court of Caddo. This sale was at auction, conducted by a public auctioneer. Most certainly the property was knocked down to the highest bidder, which was the city of Shreveport.- The consideration expressed in the deed was $12,000, to be paid in bonds to secure which a mortgage was retained. The deed recites that the property was conveyed unto “Jerome B. Gilmore, mayor of the city of Shreveport, who purchased said property by virtue of an ordinance passed May 20, 1870. Said property to be controlled and used by the corporate authority of said city as a public park.”
 

 This sale was by virtue of a writ of sale which issued in said succession. The stipulation then as to the use to which the property would be put emanated from the purchaser and not from the owner or seller. The seller’s (the public auctioneer’s) authority was limited by the terms of his writ. He was without authority to add or change any of the conditions of sale.
 

 It is dear that in the present case no rights of the original grantor are concerned.
 

 The resolution referred to in said deed reads:
 

 “That the mayor be empowered and by this authorized in the name of the city of Shreve
 
 *521
 
 port to purchase 10-acre lot 7 from the owner, and that he is authorized to give $12,000.00 coupon bonds for said 10-acre lot. Said lot to be as a city park.”
 

 This said sale is approved and ratified by M. D. O. Cain and O. W. Kittredge. The consideration which moved these parties to ratify the sale is not expressed, but it is more reasonable to suppose that, if they had any real interest, said consideration was a part of the purchase price. There is no suggestion that the sale, which they ratified, was in any sense a donation or dedication.
 

 It is well settled that a municipality cannot deal in real estate in a private capacity. It cannot purchase real estate for any other purpose than a public one. We are of the opinion that the statement of purpose contained in the resolution and deed was no part of this contract of sale. It was merely a declaration of public use without which on the face of the deed and resolution the city would have been acting in a private capacity and ultra vires.
 

 A dedication is legally defined to be “an appropriation of land to some public use made by the owner and accepted for such use by or on behalf of the public.” “Without acceptance a dedication is incomplete.” 1 Bouv. Law Diet. (15th Ed.) p. 492.
 

 The rule seems to be abundantly supported by authority that the owners of land must have an intention to dedicate, coupled with an actual abandonment of the' use of the property exclusively to the public. Close v. Swanson, 64 Neb. 389, 89 N. W. 1043.
 

 According to the strict significance, a dedication involves only the devotion by a private person of his own property to which public uses inconsistent with the exercise thereafter by the owner of a personal dominion over same. Pettitt v. City of Macon, 95 Ga. 645, 23 S. E. 198.
 

 In view of the above, 'a declaration by a city of the uses to which it intends to put certain property is not legally a dedication of said property. One city council elected for a certain short period cannot bind succeeding council's for all time, nor control such succeeding councils in their use of their discretion.
 

 A distinction is made between cases where property is purchased with funds raised by special assessment on adjacent owners and where it is paid for out of the general fund. In the present case the consideration appears to have been paid for out of the general fund.
 

 We therefore conclude that in its purchase of 10-acre lot 7 the city acquired a fee-simple title and not a servitude; that the declaration of the city as to the uses intended for the property did not arise contractually and was in no sense a legal dedication of said property binding upon the city.
 

 V. We now come to the fifth and last, and to our mind, the most serious, contention of plaintiffs. Where a municipality devotes public property to park uses for a long period of time, where such property is needed and is actually used for park purpose's, and where said municipality has spent large sums of money on these improvements as a park, can it divert such property to other public uses?
 

 It is well settled that the erection of a municipal auditorium is a public purpose.
 

 Is the erection of a public auditorium in Princess Park inconsistent, with its use as a park? An auditorium is in our view only a quasi public place. It is to be let for hire. 'Musical and other entertainments are to be given therein to which an admission is charged, which necessarily excludes the general public. Conventions are to be held by various orders, organizations, and associations which are of interest only to their members. There is in our mind a clear distinction between a public library open at all times to the public and an auditorium. An auditorium attracts large crowds and congests traffic. We do not think the many decisions holding that public libraries are not inconsistent with park usage apply to auditoriums. The question of whether or not the erection of the auditorium would destroy the property for park purposes is one of fact. The Metropolitan Museum in Central Park, New York, does not seriously interfere with its use as a park because of its relative size. An auditorium erected on a large tract like the Fair Grounds would have a far different effect than the same auditorium erected on one city block.
 

 Ten-acre lot 7 is in the form of a square 570 feet by 603 feet. The proposed building will be 240 by 150 feet, with the later erection of an additional bay contemplated. After the laying of the proposed walks, driveways, and terraces, we find as a matter of fact that the character of the lot will be changed from a public park to a public square dominated by a public building differing but slightly in comparative dimensions from the public square upon which the courthouse stands.
 

 It is true that in the unoccupied corners tennis courts, etc., may be crowded, but it is the plan that the auditorium should be used and not stand idle. It is idle to contend that with the assembling of 5,000 persons and, perhaps half as many automobiles with the unavoidable dangerous congestion of traffic that the unoccupied portions of the square will be
 
 *523
 
 suitable for a playground for children, or a place for seekers after the peace and quiet of a park.
 

 We therefore find that the erection of an auditorium of the size proposed in Princess Park is not consistent with its use as a park; that the erection of said auditorium would practically destroy the lot as a park and convert its use into a public square used as a site for public buildings.
 

 There then remains the question: Has the council the legal right, under the circumstances of the case, to convert 10-acre lot 7 from a park to a public square?
 

 Municipal corporations are bodies politic, created by the Legislature. It is an agency of the state for the purpose of local self-government, with only such duties and powers as the state in its charter has imposed upon and granted to it.
 

 The charter of the city of Shreveport is Act 158 of 1898. It provides in section 28, “That all the estates, incomes, funds or property of any description now held in trust by the city of Shreveport shall be held by the city under this act, upon and for the same uses, trusts, limits, limitations, charities, and conditions, as the same are now held.
 

 We do not understand this as anything more than a ratification of the titles and conditions under which said trusts were imposed. We do not think that it can be construed as perpetuating for all times said trusts.
 

 The power to acquire and regulate parks is conferred by the General Municipal Corporation Act, which is No. 136 of 1898. It confers the second subsection of section 13 on all municipal corporations the right to purchase and hold real estate for parks. It confers the sixth subsection of section 15 the right to regulate parks. In the twenty-second subsection of section 15 it confers full jurisdiction in the matter of streets, sidewalks, sewers, and parks; to ’open and lay out and construct the same; to repair, maintain, pave, sprinkle, adorn, and light the same. It might be contended that the words “full jurisdiction” included the right to abolish and discontinue, if it were not for the fact that the right to close and vacate any street or alley, or any portion thereof, and where the fee is in the municipality to leave or dispose of the same by sale or otherwise is specially conferred in subsection 20 of said section. If this fight was included in the words “full jurisdiction,” this subsection would be superfluous. If the wor(3s “full jurisdiction” did not include the right to discontinue streets, manifestly it did not confer that right as to parks.
 

 Therefore as the right to close or discontinue parks is not specially conferred by act, this city has only such power as is recognized by general law and jurisprudence.
 

 We have been unable.to find and have not been referred to any decision of our courts on the subject. We therefore have to turn to the decisions of the federal courts and those of other states for authorities.
 

 In 1 McQuillan on Municipal Corporations, p. 506, it is stated that many cases hold that parks are in the nature of private property, but that in other jurisdictions than Illinois, Massachusetts, Michigan, and Missouri the contrary is held.
 

 Also in the third volume, page 2538, it is stated:
 

 “Where property is acquired and paid for by the city from the general fund, with the intention, however, of using it for a particular purpose specified in the ordinance authorizing the taking, such contemplated use may be changed by the city to another and entirely different use as the requirements and needs of the city may demand.”
 

 This statement is made on the authority of Seattle Land Co. v. Seattle, 37 Wash. 274, 79 P. 780. An examination of that case shows that it was decided in 1905. In that ease the land was acquired for a park, but apparently was never used as such, but was diverted to other public use, which differentiates it from the present case. Furthermore, a reading of the case shows that the Legislature has delegated to the municipality of Seattle the right to lay out and improve parks, and to
 
 vacate
 
 same. So the question involved was the authority of their Legislature and not the municipality.
 

 The Georgia Case cited and relied upon by the city (Pettitt v. City of Macon, 95 Ga. 645, 23 S. E. 198) was decided in 1895. There land was set aside by the city for use as a cemetery and not as a park.
 

 The edition of McQuillan quoted from was published in 1911. Even the section 1155 holds only that the use may be changed as the
 
 requirements
 
 and
 
 needs
 
 of the city may demand. We cannot see that the location of the auditorium in Princess Park is either a requirement or need of the city. The ordinance authorizing it also authorizes the purchase of a site. It is not shown that there are not any other available sites. While by the location in the park the city might save the purchase price of the site, it would lose more in value by the loss of a needed and much used park.
 

 While space does not permit the review of all cases cited by both sides, and the many others in the various reports, after careful examination we conclude that the city acquired this
 
 *525
 
 property in its governmental capacity for the declared public use as a park; that it has been devoted to such use for more than 50 years; that large sums of the public’s money has been expended upon its improvements as a park; that under such circumstances it holds said property in trust for the use of the public; that as long as said property is so used and needed the municipality is without right to divert it to some other inconsistent public use.
 

 The later and, to our mind, correct, doctrine is stated in the late case of Williams v. Gallatin, decided by the New York Court of Appeals June 11, 1920, reported in the 229 N. Y. 248, 128 N. E. 121, and 18 A. L. R. p. 1238, which holds as follows:
 

 “A park is a pleasure ground set apart for recreation of the public, to promote its health and enjoyment. * * * it need not, and should not, be a mere field or open space, but no objects, however worthy, such as courthouses and sehoolhouses, which have no connection with park purposes, should be permitted to encroach upon it without legislative authority plainly conferred, even when the dedication to park purposes is made by the public itself.”
 

 The decision fits the present case exactly, and is amply sustained by many decisions.
 

 Public parks are too vital a necessity to the welfare of .cities to depend for their continu-' anee, whence once dedicated and used, upon the differing views of each succeeding city council.
 

 An exception to the capacity of plaintiffs was taken during the trial. It is not urged in the briefs; it is not well founded and is overruled. See Stevens v. Walker, 15 La. Ann. 577.
 

 For the reasons above assigned, there is judgment for plaintiffs, ordering a preliminary injunction to issue as prayed for upon the plaintiffs giving bond in the sum of $1,000.
 

 I.
 

 We do not think that the case of Ross v. City of Long Branch, 73 N. J. Law, 292, 63 A. 609, is in conflict with the opinion above quoted. There, the addition of a
 
 casino
 
 was held to be “an
 
 improvement
 
 of the park.” Here, we find that by the intended
 
 auditorium
 
 “the character of the lot will be
 
 changed
 
 from á public park to a public square dominated by a public building.”
 

 II.
 

 As to the right of plaintiffs to maintain this action, in addition to Stevens v. Walker, supra, holding that individuals may maintain actions to keep
 
 public places
 
 open, we quote from 26 Gyc. 401, approved in State ex rel. Schoeffner v. Dowling, 158 La. 706, 104 So. 624, as follows:
 

 “The true distinction seems to be that where the right or duty in question affects the state in its sovereign capacity as distinguished from the people at large, the proceedings must be instituted by the proper public officer; but that, if the general public as distinguished from the state in its sovereign capacity is affected, any member of the state may sue out the writ.”
 

 III.
 

 The Civil Code draws a distinction between public things, the property of which is vested in the state, but the
 
 use
 
 of which is common to all the inhabitants thereof, “and even strangers,” such as the seashore, river beds, highways, streets, and public parks, and public property, which is not for the common use of the inhabitants, but may be- employed for their benefit, such as, for instance, the public offices, police and fire stations, markets, sehoolhouses, etc. R. C. C. 453, 454, 458.
 

 The latter class of public property belongs absolutely to the municipality by which it has been acquired and may be dealt with as the municipality sees fit, subject only to the restrictions imposed by the deed of acquisition or by special laws.
 

 The former class of public things belongs to the people, i. e., to the state, and the municipalities have only the administration thereof, unless otherwise authorized by special laws. And to this class belongs the property in controversy herein.
 

 IY.
 

 It is true the city of Shreveport acquired the property by purchase and in full ownership, and the mere declaration in the act and in the resolution of the council that the property was purchased for park purposes did not bind the city at onqe and irrevocably to that declaration. But the fact remains
 
 *527
 
 that the city has put that intention into full execution, and for nearly 60 years has devoted the property to park purposes.
 

 No particular form of deed, or deed at all, is necessary for the dedication of land to the public; it suffices that the owner permits the land to be used by the public with the intention of making the dedication. Dedications to public use, and servitudes in favor of the public, are not governed by the strict rules which apply to private property; the visible signs of dedication and open use of the property by the public supply the place of both title and registry. Eggerson v. Anear, 6 Orleans App. 417, approved by this court October 13,1909. See, also, City of New Orleans v. Carrollton Land Co., 131 La. 1092, 60 So. 695.
 

 And we know of no law which forbids a municipal corporation to dedicate for public use any property not needed for corporate purposes or. held in trust for special uses.
 

 Decree.
 

 The judgment appealed from is therefore affirmed.
 

 OVERTON, J., concurs in the decree.