55 So.3d 840 (2010)
Steven and Melanie PETCHAK, Plaintiffs
v.
BOSSIER PARISH POLICE JURY, Defendant.
No. 45,705-CA.
Court of Appeal of Louisiana, Second Circuit.
November 24, 2010.
Rehearing Denied December 16, 2010.
*842 Booth Lockard Politz LeSage, & Odom, L.L.C., Shreveport, LA by Mark W. Odom, for plaintiffs, First Appellants.
Cook, Yancey, King & Galloway, Shreveport, LA by Kenneth Mascagni, for defendant, Second Appellants.
Before WILLIAMS, STEWART and CARAWAY, JJ.
CARAWAY, J.
This case concerns leaking underground drainage culverts which were constructed partially within a drainage easement shown to encumber the plaintiffs' lot on the 1978 plat of their subdivision. As a result of the water flow, the ground beneath plaintiffs' home has been undermined, causing foundational and structural problems. Arguing that the drainage system falls within the ownership and responsibility of the parish police jury, the plaintiffs sued the police jury to repair the leaking culverts and to pay for the damages to their home. The police jury defended the action asserting that no dedication occurred because at the time of the construction and platting of the subdivision, the drainage culverts were not laid and that the later improper installation of the underground drain was unauthorized. Following trial, the trial court ruled that the police jury was neither aware of the defective drainage system, nor did it exercise control over the system, and the plaintiffs' claims were dismissed. For the following reasons, we reverse the trial court's ruling and remand for further action.

Facts
Plaintiffs, Steven and Melanie Petchak, own a home located on Lot 363 of Country Place Subdivision, Unit No. 5, as shown on the subdivision plat (the "Plat") recorded in the Bossier Parish conveyance records. The Plat contains sequentially numbered subdivided lots, with the one exception of Lot 363, which is located to the north of Lot 291 and to the south of Lot 292. The Plat makes reference to several drainage easements, two of which are relevant to our discussion: a 25-foot easement, running north to south and located to the west *843 and rear end of Lots 363 and 291, and a 10-foot easement, connecting with the 25-foot easement and running east to west on the north side of Lot 363. The 10-foot easement straddles the boundary between Lot 363 and Lot 292 and extends 5 feet into each lot.
Unit No. 5 of Country Place was created and subdivided by actions in 1977 and 1978. After the landowner/subdivider developed and improved the property and presented preliminary plans for the subdivision, the Bossier Parish Police Jury ("Police Jury") enacted a "Resolution" dated December 19, 1977, which provides in pertinent part:
BE IT FURTHER RESOLVED that the Bossier Parish Police Jury does hereby accept into the parish road system for continuous maintenance the asphalt paved streets and drainage facilities in Country Place Subdivision No. 5.
Following this action, on January 23, 1978, the Plat was recorded in the parish conveyance records. The face of the Plat contains the stipulation that it complies with "ordinance 509 of 1968, Bossier Parish, Louisiana." Ordinance No. 509 regulates the subdivision of land within Bossier Parish and provides that the owner/subdivider "shall submit a preliminary subdivision plan" to the Police Jury that contains "[a]n adequate drainage plan for the proposed subdivision with special reference to low areas where water may collect." Additionally, under the subheading "Drainage," Ordinance No. 509 provides for the following:
(1) A right of way sufficient for the construction and maintenance of necessary drainage channels through the proposed subdivision must be dedicated in perpetuity to the Police Jury. No buildings of any kind may be erected upon the drainage rights of way so dedicated.
(2) The Parish Engineer will determine necessary capacity of the facilities proposed by the subdivider for satisfactory disposition of maximum storm run off flows where leveling operations concern drainage ways.
(3) Parish drainage rights of way, boundaries, center lines, widths and proper engineering descriptions shall be shown on plats of proposed subdivisions.
Although not specifically enumerated under the section pertaining to drainage, the ordinance also provides that "[a]ll construction work shall be done under the supervision of the parish engineer."
Additionally, at the same time as the filing of the Plat, a document titled "Protective Covenants, Country Place Subdivision Unit No. Five (5)" was filed by the owner/subdivider which stipulates as follows under the heading "Easements":
Easements for the installation and maintenance of utilities and/or drainage facilities are reserved as shown on the recorded plat.
The residence on Lot 363 was constructed sometime between 1983 and 1985. The Petchaks purchased the home in April of 1994. At the time of this suit, the configuration of structures and drainage facilities on Lot 363 and Lot 271 are shown by the following survey which was presented into evidence:
*844 
It is clear and uncontested that the residential dwelling is situated just outside of the 10-foot easement straddling the north boundary of Lot 363.
In 1995, plaintiffs noticed the development of a sinkhole in their backyard, originating at the north base of their home's foundation. Concerned about the problem, the Petchaks contacted the previous owner of their house, Theresa Kruse, who revealed that she experienced a similar problem while living in the residence. In 1992, Kruse observed a sinkhole in the backyard, located adjacent to the back patio. She called the Police Jury, who responded by filling in the sinkhole on two different occasions, first with standard dirt and later with concrete. Kruse experienced no further problems, but was told to be on the lookout for additional sinkholes. Kruse recommended that the Petchaks contact the Police Jury to correct the problem.
The Petchaks subsequently notified the Police Jury, which apparently responded sometime in 1995 by filling the location in with dirt. Ten years later, in 2005, the Petchaks began to notice problems with their home, including broken windows, sticking doors, damaged flooring, walls and woodwork and other structural problems concentrated along the northern end of their house. Additionally, the presence of a second sinkhole appeared within close proximity, approximately 1 to 1-1/2 feet, to the previously filled sinkhole. The Petchaks then retained the services of Sammie Craft, a civil engineer, who inspected the home on July 29, 2005. Craft recognized that an underground conduit or drainage culvert was pulling soil into the drain system and causing settlement. He recommended *845 that the Petchaks first fix the underground culvert system before attempting to repair their home's foundation.
The Petchaks once again informed the Police Jury of the situation and in January of 2006 they met with Butch Ford, the parish engineer, to discuss possible solutions. Ford offered to fix the culverts, but only in the event that the Petchaks sign a release for any past and future damages associated with the problem. The Petchaks refused to sign the waiver.
Thereafter, on July 12, 2006, the Petchaks filed this suit asserting that the Police Jury was liable for damages caused to their home as a result of the defective drainage system. The petition alleged that the Police Jury maintained custody and control over the culvert system by virtue of its rights obtained by the subdivision's dedication to the public of all streets and drainage. Plaintiffs prayed for the repair of both the drainage system and their home. The Police Jury answered, denying responsibility for the drain and pleading the provisions of La. R.S. 9:2800 as the measure of any claim for negligence. By way of reconvention, the Police Jury complained that the plaintiffs' conduct of maintaining structures and performing work over or near the drainage system caused damage to the culverts and made any effort to maintain or repair the system impossible or substantially more burdensome. The Police Jury thus claimed that it was entitled to "recover from original petitioners the cost and expense of steps necessary to maintain the system and to change the drainage system, including but not limited to the cost and expense of plugging, laying, and/or moving the drainage pipe or system." The prayer provided that:
[T]here be judgment in favor of the BOSSIER PARISH POLICE JURY and against STEVE PETCHAK and MELANIE PETCHAK, awarding the BOSSIER PARISH POLICE JURY the cost of repair and movement of the drainage system, at plaintiff's cost.
The Police Jury additionally filed an exception of prescription asserting La. R.S. 9:5624.
Prior to the filing of suit, the exact location of the subterranean culvert system as depicted on the above survey was undetermined. Through an underground survey procedure, it was discovered that 18-inch reinforced concrete culverts originate from a storm drain located on the adjacent Lot 291 and run in a northerly direction through the 25-foot drainage easement onto Lot 363. The drain then cuts across a portion of the northwest rear corner of the Petchaks' lot, outside of the servitude, before entering the 10-foot easement running east along the northern edge of plaintiffs' lot adjacent to the residence. The pipe then crosses a portion of the Petchaks' front yard, again outside the servitude, before entering the public storm drain underlying Glendale Lane.
The camera used in the underground survey also revealed that the pipe was not constructed in accordance with good engineering practices, as several 45 degree turns in the concrete culverts were identified. According to expert witnesses, any time there is a change in direction in a concrete culvert system, a separate junction box is required to assure the stability of the joint and to prevent any separation of concrete. Because the instant "snake" pipe did not contain such junction boxes, experts believed either water was escaping from the culvert or dirt was infiltrating into the system, causing destabilization of the soil surrounding the drain. The drain in the Petchaks' backyard was likely bedded in a granular fill, as opposed to the typical clay that was normally used in Country Place. This material is described *846 as "quick to erode." The soil from underneath the Petchaks' house accumulated anywhere from six to eight inches deep inside the culverts. The loss of this "support soil" from under the home's foundation caused the large two or three foot "void" underneath the Petchaks' house, resulting in approximately six inches of downward settlement.
A bench trial was conducted over a three-day period. Experts for both sides provided testimony regarding the poorly constructed drain system. The Petchaks asserted that the Police Jury maintained custody of the drain because the system not only served the purpose of public drainage, but the offending portion of the drain was located within the dedicated drainage easements beside their home. Conversely, the Police Jury presented evidence that the particular culverts in question were not installed at the time of the formation of the subdivision and the filing of the Plat in 1978. This was because the intended use of Lot 363 was originally undetermined.[1] The drain was apparently constructed at the time of the construction of the residence of Lot 363 between 1983 and 1985. The Police Jury further contended that it never would have accepted such a poorly constructed "snake" drain that was not located entirely within the drainage easement.
By judgment dated February 1, 2010, all claims against the Police Jury were dismissed with prejudice. Additionally, defendant's exception of prescription was denied, along with its reconventional demand for the cost of repair of the drainage system.
In its written opinion, the trial court found that the Police Jury was neither aware of the defective drainage system, nor did it exercise control over the system. Specifically, the court concluded:
Therefore, the police jury cannot be held responsible for the maintenance of a storm drain pipe for which they did not approve or accept, especially when the storm drain pipe was improperly constructed per the testimony of all the expert engineers that testified at trial.
The Petchaks now appeal. The Police Jury answers the appeal to assert again its exception of prescription.

Discussion

I.
The initial issue concerns whether the Police Jury acquired a property right or drainage servitude upon the filing of the subdivision Plat in 1978, or thereafter. The evidence indicates that when the Plat was filed the culverts for the drain had not been laid, and the trial court's opinion appears to have accepted that fact in its ruling. Nevertheless, additional conclusions from the evidence are that the need for drainage for the lots south of the plaintiffs' lot was recognized in the survey and engineering plans for the subdivision as shown by the drainage "easement" depicted on the Plat and that the need for drainage still exists. With this situation, did the Police Jury acquire a drainage servitude affecting the plaintiffs' lot?
*847 In its Ordinance No. 509 setting forth the regulations for Bossier Parish subdivisions and the provisions for approval of plats, the Police Jury required that "right of ways" for necessary drainage be "dedicated" to the Police Jury. Like the dedication of the streets in a subdivision, proper drainage facilities serve an important public need, and the political subdivision, which will maintain the drainage facilities at taxpayer expense, may regulate the installation of such facilities and acquire a property right in the form of a servitude for the drainage "right of ways."
The parties' arguments identify the four modes of public dedication recognized in Louisiana: formal, statutory, implied, and tacit. Cenac v. Public Access Water Rights Ass'n, 02-2660 (La.6/27/03), 851 So.2d 1006; St. Charles Parish Sch. Bd. v. P&L Inv. Corp., 95-2571 (La.5/21/96), 674 So.2d 218. In this case, there was no formal and specific written act by which the owner of the subdivision conveyed a servitude to the Police Jury. Thus, there was no formal dedication. Likewise, a tacit dedication under La. R.S. 48:491 is not supported by the facts. The controversy centers therefore upon whether a statutory or implied dedication occurred. The Police Jury reviews the principles for such dedications and argues that no dedication of a servitude occurred because of the lack of construction of the drain facilities in 1978 at the time of the Plat. The Police Jury also contends that it never certified that the eventual construction of the drainage culverts in question was proper and that it never accepted or maintained the drain as its property.
Before the enactment in 1896 of what is now La. R.S. 33:5051, controversies concerning the public's rights for use of roads, streets and other public places were determined in the jurisprudence. The disputes involved situations where there was no formal written act granting and dedicating rights to a political subdivision for public use of the land. Nevertheless, because the public use had clearly arisen over time, the courts found under certain circumstances that the owner had implicitly permitted the land to be used by the public with the owner's intention of making a dedication. Anderson v. Thomas, 166 La. 512, 117 So. 573 (1928); City of Shreveport v. Walpole, 22 La. Ann. 526, 1870 WL 5399 (1870). A key circumstance giving rise to an implied dedication is the sale of lots with reference to an original plan of a city or the plat of a subdivision. See, A.N. Yiannopoulos, Predial Servitudes § 220, in 4 Louisiana Civil Law Treatise (3d ed.2010) and cases cited therein.
Statutory guidance for the dedication of streets and alleys for public use came through La. R.S. 33:5051 which sets forth requirements for the platting and subdividing of land for the sale of lots. There is a significant body of jurisprudence interpreting La. R.S. 33:5051 and finding the transfer of rights in the immovable to a political subdivision through what is referred to as statutory dedication. The jurisprudence holds that the statutory requisites for the subdivision plat listed under La. R.S. 33:5051(B)[2] need not be completely *848 shown on the plat so long as a substantial compliance with those items is met. Garrett v. Pioneer Production Corp., 390 So.2d 851 (La.1980).
Although La. R.S. 33:5051 does not specifically address drainage concerns for a subdivision, Section B(6) requires the subdivision plat to contain "[A] certificate of the parish surveyor or any other licensed land surveyor of this state approving said map and stating that the same is in accordance with the provisions of this Section and with the laws and ordinances of the parish in which the property is situated." This reference to laws and ordinances of a parish is broad enough to warrant consideration of the following provisions of Title 33 addressing parish government and the regulation of water and sewage facilities necessary for the subdivision of land for residential sale:
La. R.S. 33:112. Subdivision regulations.
A. Before exercising the powers referred to in R.S. 33:110, a parish planning commission shall adopt regulations governing the subdivision of land within unincorporated territory within its jurisdiction for purposes other than agricultural.
* * * * * *
D. Such regulations may include provisions as to the extent to which roads, streets, and other ways shall be graded and improved and to which water and sewer and other utility mains, piping, or other facilities shall be installed as a condition precedent to the approval of the plat. The regulations or practice of a commission may provide for a tentative approval of the plat previous to such installations; but any such tentative approval shall be revocable and shall not be entered on the plat. In lieu of the completion of such improvements and utilities prior to the final approval of the plat, a commission may accept a bond with surety to secure to the parish or municipality, as the case may be, the actual construction and installation of such improvements or utilities at a time and according to specifications fixed by or in accordance with the regulations of the commission. The parish or municipality, as the case may be, may enforce such bond by all appropriate legal remedies.
From our review of Ordinance No. 509, the Police Jury clearly followed the grant of authority and directives of La. R.S. 33:112 in its regulation by this ordinance of the public drainage concerns attendant to the subdivision of land in the parish. There is reflected within the ordinance:
(i) A specific intent by the Police Jury to receive a dedicated "right of way" for necessary drainage which the subdivider "must" grant as a part of the process for approval of the subdivision.
(ii) Requirements for a preliminary submission of the subdivision plan showing the proposed location of all easements and for the preliminary approval of the Police Jury before installation of necessary improvements, including drainage facilities. In that process the parish engineer determines the necessary capacity *849 for the proposed drainage facilities.
(iii) A final approval process after installation of the subdivision facilities in which "the final plat" must be found to conform to the initial plan for the public improvements before recordation of the plat and any sale of lots in the subdivision.
Ordinance No. 509 also addresses a specific concern identified by the legislature in La. R.S. 33:112(D) which is central to this dispute. In lieu of the completion of the necessary public improvements and utilities, the parish may accept a bond with a surety and grant a tentative approval for the subdivision. Though not entirely clear, the state statute indicates that with such "tentative approval of the plat" sales of lots might begin but that those sales will be without "such tentative approval ... entered on the plat." The bond, of course, would then insure that the public improvements depicted on the plat, which were required and reviewed by a police jury through the preliminary planning, are eventually constructed. The prohibition of the listing of unfinished improvements or a "tentative" completion matter on the "plat" reflects an important concern and policy. The public, who will soon invest for the use and enjoyment of the subdivision by their purchases of lots, understands and measures the sufficiency of the improvements and utilities and their dedication as public property by reliance on what the recorded final plat reveals. If the final plat reflects a necessary public improvement that has yet to be constructed and that improvement is held out to the public by the recordation of the plat indicating parish approval and a dedication to the public, the parish must obtain a bond to insure that such improvement eventually serves the lot owners and public.
From our review of the jurisprudence, all other instances of statutory dedication have involved the application of La. R.S. 33:3051 pertaining to streets, roads and alleys, making this case unique.[3] In those cases, despite the absence of a written act by which the owner expresses his intention to convey and the public body expresses its acceptance of the property right, the filing of the subdivision plat in substantial compliance with the statute results in a conveyance affecting the immovable. Garrett, supra. Under the jurisprudence, the intent of the landowner/grantor is shown by his actions in planning for the subdivision, his signature on the plat, and his subsequent sales of lots in reference to the plat. The political subdivision's acceptance of the property right can be shown by various factors including the exercise of its regulatory control of the planning for the street improvements, its formal approval of the subdivision by a vote of the political subdivision, its certification placed upon the plat, and its maintenance of the street and alley improvements. Nevertheless, the courts have held that the dedication is complete without a formal acceptance by the political subdivision and without the construction and use of street improvements. Arkansas-Louisiana Gas Co. v. Parker Oil Co., 190 La. 957, 183 So. 229 (1938); Walker v. Coleman, 540 So.2d 983 *850 (La.App. 2d Cir.1989); Kavanagh v. Bowers, 02-248 (La.App. 5th Cir.6/26/02), 826 So.2d 1165, writ denied, 02-2086 (La.11/1/02), 828 So.2d 575. Additionally, a local governing authority has no legal right to disclaim title to the streets and alleys. Police Jury, Jefferson Parish v. Noble Drilling Corp., 232 La. 981, 95 So.2d 627 (1957); Boagni v. State, Through Dep't of Transp. and Dev., 399 So.2d 813 (La.App. 3d Cir.1981), writ denied, 404 So.2d 497 (La.1981).
With this understanding of statutory dedication, we hold that the Police Jury's ordinance, its December 19, 1977 Resolution of acceptance, its certification by the office of the parish engineer placed on the Plat, and the recordation of the subdivision Plat serve as the basis for a statutory dedication and for the Police Jury's acquisition of an interest in the property for the subdivision, including in particular Lot 363. Like La. R.S. 33:5051, Ordinance No. 509 imposed duties on the subdivider for drainage facilities and the designation of right of ways for the water flows through the subdivision. Such designation for the area of the plaintiffs' land affected by the drainage servitude was set forth on the Plat for Country Place, and both the surveyor for the project and the parish engineer signed the Plat with the subdivider/owner, certifying compliance with Ordinance 509. The presence of the ordinance with its statutory force and the actions of the Police Jury in monitoring compliance with the ordinance in the construction of the subdivision and signing the subdivision Plat were sufficient to complete in 1978 the dedication of the area of land shown as the drainage easement affecting plaintiffs' lot.
In reaching this conclusion, we are not persuaded by the Police Jury's arguments concerning the lack of construction of the drainage improvement at the time of these actions in 1977 and 1978. The cited jurisprudence regarding statutory dedications is to the contrary. The Police Jury's allowance of the formal platting of the subdivision with the Plat's recordation and the subsequent sale of lots holds out to the public that the "easement" for this drainage need was conveyed and accepted by the Police Jury as a public right for the remedy of that need.
Having determined that a conveyance or dedication of a "right-of-way" to the Police Jury by the 1978 filing of the Country Place Plat occurred, we will address our law on personal and predial servitudes for consideration of the nature of the right which was acquired. One may have various rights in an immovable including personal and predial servitudes. La. C.C. art. 476. A personal servitude is a charge on a thing for a benefit of a person. La. C.C. art. 534. The personal servitude of right of use confers in favor of a natural person or legal entity a specific use of an estate less than full enjoyment. La. C.C. arts. 639 and 641. The right of use may confer only an advantage that may be established by a predial servitude. La. C.C. art. 640. A specific predial servitude identified in the Civil Code is the servitude for drainage, whether a natural drain under Article 655 or conventional servitude for drain under Article 699. La. C.C. arts. 655 and 699.
In this setting, the Police Jury owned no neighboring tract or dominant estate which would receive the actual benefit of drainage and the "advantage" by the direction of the flow of water from such tract across a servient estate. Nevertheless, the Police Jury desired a "right of way" which in substance is a personal servitude, right of use. The Police Jury obtained this right of use servitude by the operation of its ordinance for the "advantage" of drainage which the members of the public and prospective owners in the subdivision *851 may enjoy. The right of use servitude gave the Police Jury the exclusive right to use the 25-foot and 5-foot easement areas on plaintiffs' lot designated on the Country Place Plat by installing and maintaining underground drainage facilities. The right of use was a burden or encumbrance on the ownership of the plaintiffs' lot limiting the use of that lot. This substantive regime encumbering the immovable property and importing real obligations arose upon the filing of the Plat in 1978.
Additionally, the disputed drainage servitude in this case has a direct benefit for one or more of the neighboring lots in the subdivision. The water drain begins with an intake located on Lot 291 and therefore serves that lot and possibly other lots south of the plaintiffs' lot. To that extent, the servitude shown on the Plat provides a specific predial servitude for those lot owners. Summers v. Vermilion Parish Police Jury, 00-1084 (La.3d Cir.2/28/01), 784 So.2d 15, writ denied, 01-1404 (La.6/29/01), 794 So.2d 816.
In summary, upon the subdivision owner's recordation of the Plat in 1978, the Police Jury was vested with the real right of a personal servitude right of use affecting the immovable for this "right of way" area for drainage. Prospective owners of the lots in the subdivision were bound by the Police Jury's ownership of the real right. An owner of Lot 291 could expect the advantage of the servitude of drain, yet the 25-foot easement across the rear of his lot was within the Police Jury's "right of way" or servitude control. The lot owned by the plaintiffs was burdened by the servitude as a servient estate to allow the flow of water across the lot.
As a final matter, long before the damage to the plaintiffs' home occurred, the Police Jury acted in a manner recognizing and asserting its ownership of this right of use servitude on the plaintiffs' lot after the construction of the residence. In 1992, the previous owner of the Petchaks' home, Theresa Kruse, reported the occurrence of a sinkhole, and the Police Jury responded by filling in the sinkhole on two separate occasions and telling her to be on the lookout for additional sinkholes. Kruse further inquired regarding the need for the manhole or junction box which extends aboveground within the 25-foot portion of the drainage easement at the rear of Lot 363. She was informed that the manhole was necessary for the drainage system for the benefit of the neighbor's yard and that the Police Jury would not allow its removal or alteration. Subsequently, approximately three years later, the Police Jury was contacted by the Petchaks in relation to an additional sinkhole located on Lot 363. The Police Jury once again responded by filling the location in with dirt.
James W. Ramsey, the parish administrator and engineer for the Police Jury from 1964 until 1994, testified that he responded to the call from Kruse in 1992 concerning the sinkhole. He stated that because of the surface depression he assumed that there was an underground pipe, likely with a "bad joint," drawing the dirt down into the ground. He later sent a parish work crew to fix the problem. Finally, while noting the mislocation of a portion of the drain culverts, Ramsey admitted that the drain in question between lots 363 and 291 is "draining water for a public purpose and at the same time is going into a public drainage system" under the street in front of plaintiffs' home.

II.
The next issues relate to the Police Jury's position that plaintiffs are asserting a tort claim under La. R.S. 9:2800, which provides that "no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 *852 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so." Asserting that the action is in tort, the Police Jury presents various defenses. First, the Police Jury argues that the construction of the defective drainage system was by an unknown builder or other party after the creation of the subdivision in 1977-1978 and before the construction of the Petchaks' residence in the early 1980's. The system lies in part outside the "easement" areas which encumber Lot 363. The Police Jury argues that this defective construction by another party precludes a finding of the Police Jury's garde or custody over the defective drain. Second, the Police Jury claims that it lacked actual or constructive notice of the defective culverts. Third, as an alternative argument, the Police Jury asserts comparative fault regarding the actions of the unknown party who constructed the defective drain.
As discussed above, the Police Jury's right of use servitude is a real right that encumbers the ownership of plaintiffs' immovable, establishing a relationship involving a "specified use" of the property in the nature of a predial servitude. La. C.C. arts. 476, 639, 640 and 645.[4] Plaintiffs' lot is therefore a servient estate that owes a charge for the benefit of the drainage of the subdivision. La. C.C. art. 646. Plaintiffs' obligation to allow the passage of the water across their property is not a personal obligation but a real obligation because it is a charge on the servient estate that all successive owners of Lot 363 must bear. La. C.C. arts. 1763 and 1764.[5] As a correlative real obligation governing the dismemberment of the usus right of ownership of the immovable,[6] the owner of the dominant estate, or in this case the owner of the personal servitude, must exercise his "specified use" without exceeding the boundaries of that use in a manner damaging the concomitant use of the servient estate. See former Article 778 of 1870 Civil Code. "The owner of the dominant estate may not make use of the servitude that aggravates the condition of the servient estate." Yiannopoulos, supra § 156; Board of Comm'rs of Port of New Orleans v. Illinois Central Gulf R.R. Co., 379 So.2d 838 (La.App. 4th Cir.1980), writ denied, 380 So.2d 1210 (La.1980); Oswalt v. Irby Const. Co., 424 So.2d 348 (La.App. 2d Cir. 1982); Duet v. Louisiana Power and Light Co., 169 F.Supp. 184 (E.D.La.1958); Jackson *853 v. Jackson, 00-2591 (La.App. 1st Cir.3/6/02), 818 So.2d 192.
The statutory dedication of this right of use servitude was an act transferring an immovable in which the participation and consent of both the subdivider and the Police Jury defined the "specified use" of the real right. Like the creation of a personal or predial servitude by contract, the specified use and extent of this servitude is regulated by the statutory dedication by which it was created. The "specified use" in this case is not only confined within the geographical boundaries of the easement areas shown on the Plat, but is also limited by an implicit requirement for properly controlled water flow across Lot 363 through appropriate underground facilities.
The issue of tort responsibility in contexts where parties have a pre-existing obligatory relationship has been considered in the jurisprudence in terms of whether the breach involves the violation of a general duty owed to all persons or a specific duty owed because of that prior relationship. Federal Ins. Co. v. Insurance Co. of North America, 262 La. 509, 263 So.2d 871 (La.1972); Baugh v. Parish Government Risk Mgmt. Agency, 30,707 (La.App.2d Cir.6/24/98), 715 So.2d 645; Davis v. Le Blanc, 149 So.2d 252 (La.App. 3d Cir.1963). For example, in certain circumstances, the same acts or omissions may constitute breaches of both general duties and contractual duties so as to give rise to actions both in tort and in contract. Baugh, supra at 647. In this case, the pre-existing relationship between these parties before the damage to plaintiffs' home was that of the owner of the right of use servitude and the owner of the servient estate. This gave rise to the possibility of the breach of the real obligations identified above and an indemnity which might then be due from either the owner of the personal servitude or the owner of the servient estate concerning the use or misuse of the servitude. See, Official Comment (f) to La. C.C. art. 1764. In that sense, we do not find that the duty of the owner of the personal servitude to refrain from using the servitude in a manner that aggravates the condition of the servient estate is a tort duty owed generally to all persons.
Additionally, the nature of the plaintiffs' claim is brought into focus by an essential issue raised by both parties' pleadings and left totally unaddressed by the trial court's judgment. The plaintiffs not only sought recovery of the damages to the home, they sought a properly repaired drainage system within the confines of the easement areas encumbering their lot. Likewise, the Police Jury, effectively acknowledging its ownership of the drainage system servitude, asserted by its reconventional demand that the broken system be repaired by the Police Jury at the cost of the plaintiffs. Both parties recognize that this drain, serving adjoining lot owners who were not made parties to this action, must be repaired to serve the subdivision's need for drainage. The plaintiffs cannot simply plug the underground culvert as it first enters their property from Lot 291 without violating the public drain servitude. The Police Jury did not present evidence that no public drain is needed and that it may abandon its personal use servitude. The ongoing erosion caused by the flow of water will continue the damage to plaintiffs' property and possibly the adjacent Lot 292.
The remedy sought by both parties' claims to repair the drainage system is therefore not a tort remedy. It relates totally to their mutual rights in Lot 363 and the continued use of the servitude. In view of our holding above recognizing the Police Jury's ownership of this right of use *854 servitude for drainage, we find that the Police Jury, as owner, must remedy its broken system at its cost.
This same cause of action which requires the Police Jury to fix the problem causing past (and future) damages to the servient estate also requires indemnification for those damages. The damages caused by the flow of water through the defective drain system are not remedied by our law of tort but by the above law regulating the relationship between the owner of land and the owner of a real right which burdens that land. The comparative fault principle application to tort claims under La. C.C. art. 2323 therefore does not apply. The Police Jury is not excused from the obligations regarding its ownership of the servitude by the fact that an unknown party, twenty or more years before, trespassed upon the Police Jury's easement and constructed the system haphazardly in a snaking fashion, partially within the easement and partially without.
Our discussion above reviewing La. R.S. 33:112(D) and Ordinance No. 509 shows that the Police Jury did not follow the state statute and its own ordinance when it allowed the conveyance and dedication of the public drainage servitude through the platting procedures and the depiction of that servitude/easement on the Plat without insuring the system's later installment by obtaining a bond. In the absence of insistence for a bond, the conveyance of the now disputed servitude was completely avoidable had the Police Jury instructed the subdivider/owner to remove the "easements" affecting Lots 363 and 291 from the Plat.
Even though the drain in question only serves a few lots and the status of Lot 363's use as a residential lot was left optional in 1978, this does not diminish the import of the drain's depiction on the Plat as a public servitude within the care and maintenance of the Police Jury. When the Petchaks determined to purchase the lot in 1994, they could (i) view the manhole cover in the 25-foot easement on the lot, (ii) understand that their prospective ownership of Lot 363 would be subject to the right of use by the public as shown by the easements' depiction on the Plat, and (iii) trust that the Police Jury's use and maintenance of that servitude would not aggravate the condition of their residence. Prospective homeowners do not typically conduct underground surveys of the condition of the utilities in easements affecting residential lots. The duties regarding the real obligations flowing from this ownership regime are for the protection of both the public use of the servitude and the homeowner's use of his lot.
Finally, since we find that the uncontrolled use of the servitude by the drainage flow of the water was a breach of the servitude owner's real obligation to the owner of the servient estate, the general negligence requirement in tort of a defendant's knowledge or constructive knowledge of the defect of a thing in one's custody is not applicable. In any event, the Police Jury's prior maintenance responses on the property regarding the various sinkholes demonstrate, at a minimum, constructive knowledge of a problem with the drain system by 1992.

III.
The Police Jury asserts that the Petchaks' claim has prescribed under La. R.S. 9:5624, which provides:
When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works.
The purpose of La. R.S. 9:5624 is to limit the exposure of the state and its political *855 subdivisions to liability in connection with a public work to a reasonable period. Avenal v. State, 03-3521 (La.10/19/04) 886 So.2d 1085, cert. denied, 544 U.S. 1049, 125 S.Ct. 2305, 161 L.Ed.2d 1090 (2005); Lyman v. Town of Sunset, 500 So.2d 390 (La.1987); Roberson v. Lincoln Parish Police Jury, 39,418 (La.App.2d Cir.3/23/05), 899 So.2d 636. Not every lawsuit for damages caused by a public entity or involving a public works project falls within the purview of La. R.S. 9:5624. In order to fall under the statute, the damage must be incurred "for public purposes." Damage is incurred "for public purposes" when the damage is intentional or occurs as a necessary consequence of the public project. Avenal, supra.
The "completion and acceptance" of a public works project is not involved in this case. The damage to plaintiffs' home resulted from the Police Jury's specified use of the drain servitude, as the water flow over an extended period of time caused erosion. We therefore find this two-year prescription statute inapplicable. Furthermore, the record indicates that plaintiffs acted within one year of their discovery of the problem with the drainage system.

Conclusion
For the following reasons, the ruling of the trial court dismissing plaintiffs' claims against the Police Jury is reversed. It is hereby ordered, adjudged and decreed that the Police Jury repair the public drainage culverts and piping, locating the drain within the easement areas affecting Lot 363. Since the trial court dismissed plaintiffs' claims for damages altogether and did not reach and resolve the disputed evidence concerning the issue of plaintiffs' damages, the case is remanded to the trial court for that determination.
Costs of appeal are assessed to the Police Jury in accordance with La. R.S. 13:5112 in the total amount of $318.00, representing costs of $171.50 owed by the Police Jury and $146.50 in costs paid by the Petchaks.
REVERSED AND REMANDED.
STEWART, J., concurs with reasons.
STEWART, J., concurring.
Pursuant to La. R.S. 33:1236(13), police juries have the power to maintain drainage in their respective parishes. In Corinne Park Civic Ass'n v. Police Jury of St. Bernard Parish, 416 So.2d 106 (La.1982), homeowners and a civic organization sued the St. Bernard Parish Police Jury for damages due to the periodic overflow of the Kierr Canal. They alleged lack of maintenance by the police jury, which denied having the responsibility for drainage in the parish and asserted that it never undertook to maintain the canal pursuant to the discretionary authority to do so under La. R.S. 33:1236(13). The supreme court rejected these arguments and affirmed the appellate court's determination that the police jury assumed responsibility for maintaining the canal. The record showed that the canal was an integral part of the subdivision's drainage system as shown by the subdivision survey, drainage plan, and Act of Dedication. The matter was remanded for a determination of whether the police jury was liable for faulty maintenance.
As discussed in this court's opinion, a dedication of a right-of-way to the Police Jury was effected by the filing and acceptance of the subdivision plat. Moreover, the record shows that the Police Jury acted under its statutory authority to maintain drainage on three occasions by filling the sinkholes reported by Theresa Kruse and then by the Petchaks. Having accepted the subdivision plat and then *856 undertaken to address and correct the drainage-related problems reported by these homeowners, the Police Jury assumed the responsibility for the defective drainage system and had the duty to properly maintain it.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, CARAWAY, DREW and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] The document containing the covenants for Country Place Subdivision, Unit No. 5, dated January 23, 1978, allowed the option for the later conversion of lot 363 into a public street or otherwise for the use of the lot for a residence. James Mohr, civil engineer and land surveyor, who was involved in the design of Country Place Subdivision, explained that Lot 363 was out of sequential numerical order because it was not intended to be slotted for residential construction; rather it was the intent of the developer to leave it open for the possible construction of additional streets to tie in prospective development to the west. Mohr further testified that the pipe was not in existence at the time of the 1977 dedication because it was unclear of the lot's intended use.
[2] La. R.S. 33:5051 B. The map referenced in Subsection A of this Section shall contain the following:

(1) The section, township, and range in which such real estate or subdivision thereof lies according to government survey.
(2) The dimensions of each square in feet, feet and inches, or meters.
(3) The designation of each lot or subdivision of a square and its dimensions in feet, feet and inches, or meters.
(4) The name of each street and alley and its length and width in feet, feet and inches, or meters.
(5) The name or number of each square or plat dedicated to public use.
(6) A certificate of the parish surveyor or any other licensed land surveyor of this state approving said map and stating that the same is in accordance with the provisions of this Section and with the laws and ordinances of the parish in which the property is situated.
(7) A formal dedication made by the owner or owners of the property or their duly authorized agent of all the streets, alleys, and public squares or plats shown on the map to public use.
[3] In Simmons v. Board of Com'rs of Bossier Levee Dist., 624 So.2d 935 (La.App. 2d Cir. 1993), this court recognized a drainage-related easement shown on a subdivision plat, determining that a servitude had been "dedicated." It was unclear whether a statute or ordinance served as the basis of the "dedication" or whether implied dedication was the basis of the transfer and creation of the servitude. See also, Best Oil Co. v. Parish Council of East Baton Rouge Parish, 176 So.2d 630 (La.App. 1st Cir.1965), writ denied, 248 La. 365, 178 So.2d 656 (La.1965).
[4] La. C.C. art. 645: Regulation of the servitude.

A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude.
[5] La. C.C. art. 1763: Definition.

A real obligation is a duty correlative and incidental to a real right.
La. C.C. art. 1764: Effects of real obligation.
A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect.
But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning the thing.
[6] "The right of ownership, which according to traditional civilian analysis includes the elements of usus, fructus and abuses, may lawfully be dismembered in a variety of ways either by the intention of the owner or by operation of law." Richard v. Hall, 03-1488 (La.4/23/04), 874 So.2d 131, 144.